# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **VICTOR ANGELINE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:07-CV-0292-RDP** |
| | } | |
| **CITY OF HOOVER, ALABAMA,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the Motion for Summary Judgment (Doc. # 31) filed by Defendants City of Hoover, Alabama; Nicholas C. Derzis; David Holder; Nina Monosky; and Bruce Scarborough (hereinafter, collectively, "Defendants") on March 21, 2008, and the Motion to Strike (Doc. # 44) filed by Defendants on April 22, 2008.  The motions have been fully briefed and were under submission as of May 13, 2008. (*See* Docs. # 9, 12; Margin Order of November 26, 2007; Margin Order of January 29, 2008).

Plaintiff Victor Angeline's complaint, initially filed on February 13, 2007, and later amended on May 9, 2007, alleges various state and federal claims arising out of his November 3, 2005 arrest for misdemeanor driving under the influence of any substance in violation of Alabama Code § 32-5A-191(a)(5), and felony unlawful possession of a controlled substance in violation of Alabama Code § 13A-12-212.  (Docs. # 1, 13-2).  Plaintiff's claims are alleged against the City of Hoover (the "City") and four individual defendants in their individual capacities - Chief of Police Nicholas Derzis, Officer Nina Monosky, Officer Bruce Scarborough, and Officer David Holder.  (Docs. # 1,

13-2).[1]   Plaintiff's complaint alleges only one basis for original jurisdiction –  federal question jurisdiction under 28 U.S.C. §1331.  (Doc. # 1).  As to Plaintiff's state law claims, Plaintiff invoked the court's supplemental jurisdiction under 28 U.S.C. § 1367.  (Doc. # 1).

For the reasons outlined below, the court finds that Defendants' motion is due to be granted in part and denied in part.  Defendant's motion to strike will be denied.[2]

## I.      Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking

_____

[1] After Plaintiff's initial complaint was filed on February 13, 2007, the court dismissed the following claims and defendants on March 1, 2007, upon motion by Defendants (Doc. # 5), and after conferring with all counsel: (1) all claims asserted against the individual defendants in their official capacities; (2) Count IX which sought injunctive relief; (3) the defendant identified as "The City of Hoover Police Department;" and (4) the fictitious party identified as "John Doe."  (Doc. # 8).  On March 5, 2007, by agreement of the parties, the court also dismissed Plaintiff's demand under § 1983 for punitive damages against the City.  (March 5, 2007 Margin Order).  Plaintiff's May 9, 2007 Amended Complaint added David Holder as a defendant and, consistent with the court's prior ruling, removed the Police Department and John Doe as defendants. (Doc. # 13-2; May 9, 2007 Margin Order).  However, despite the court's March 1, 2007 order, Plaintiff's Amended Complaint still alleged claims against the individual defendants in their official capacities and seeks injunctive relief in Count IX.  (Doc. # 13-2).  These claims have already been dismissed by the court and will not be discussed herein.

[2] The court has reviewed Defendants' motion and will assume, without deciding, for the purposes of summary judgment only, that it is due to be denied and that the evidence sought to be stricken is properly before the court in its summary judgment analysis.   The court is granting summary judgment in favor of the Defendants on all claims except Plaintiff's claims relating to his arrest for possession of a controlled substance, to which none of the evidence sought to be stricken relates.  Thus, the court finds that, even considering the evidence sought to be stricken, Plaintiff has not met his burden to show that there are material issues of fact with respect to the other claims in this case.

for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## II.    **Relevant Undisputed Facts**[3]

On the morning of November 3, 2005, Plaintiff was working with Greentree Transportation Company ("Greentree"), under contract with the Red Cross, to deliver relief supplies to the victims of Hurricane Katrina. (Plaintiff Depo., pp. 22-24). At 7:30 a.m., Plaintiff presented to his supervisor/dispatcher in Montgomery, Alabama, for work. (Plaintiff Depo., p. 26). Plaintiff's supervisor first assigned him to the task of moving trailers from the dock at the warehouse, which required Plaintiff to use concentration and skills such as backing, attaching, and detaching trailers.

---

[3] If facts are in dispute, they are stated in the manner most favorable to Plaintiff, *Fitzpatrick*, 2 F.3d at 1115, although the court has noted when facts are in dispute.

(Plaintiff Depo., p. 27; Plaintiff Aff.). Once this task was completed, Plaintiff was dispatched around 8:00 or 8:30 a.m. to Birmingham to make a delivery of canned goods to the food bank. (Plaintiff Depo., pp. 27-29, 216). Although Plaintiff did not know the exact location of the food bank in Birmingham (Plaintiff Depo., pp. 28, 32), he nevertheless set out on Interstate 65 North ("I-65") to Birmingham in his eighteen-wheeler truck which has a dark red (maroon) cab and a white trailer (Doc. # 32, Exhibit 15, p. 3). Upon approaching Birmingham, Plaintiff's truck exited I-65 onto the Alford Avenue Exit to ask for directions to the food bank. (Plaintiff Depo. pp. 32-33; Arrest Report).

### A.  911 Calls

That same morning, a private citizen, Owen Duke, also was traveling on I-65 North to Birmingham, and while nearing the Oak Mountain Amphitheater area, he witnessed an eighteen-wheeler being driven erratically and drifting from left to right through the highway lanes. (Duke Aff., p. 1). Duke observed that the truck, which had a dark red cab, also drifted into the emergency lane on the right side of the interstate. (Duke Aff., pp. 1-2). According to Duke, there were times when traffic almost came to a complete stop on I-65 because of the truck's erratic driving. (Duke Aff., p. 2). As Duke recalls, the truck was swerving through lanes and driving erratically for approximately 10 minutes. (Duke Aff., p. 2).

Duke called 911 at least twice to report the truck's erratic driving. (Duke Aff., p. 2). Duke gave the 911 operator a description of the truck, including the name "Greentree Transportation" on the trailer and the tag number. (Duke Aff., p. 2). Duke also reported what mile marker he was approaching so that the operator would know where to send a police officer. (Duke Aff., p. 2). According to Duke, he stayed with the truck until it pulled off onto an exit ramp, and he noted that it continued to swerve into other lanes until it pulled off the interstate. (Duke Aff., p. 2). Duke

followed the truck onto the exit ramp, but once the truck reached the top of the ramp, it started rolling backwards. (Duke Aff., p. 2). Duke parked his car approximately three hundred (300) feet behind the truck because he thought the truck was going to roll back into his car. (Duke Aff., p. 2).

After Duke called 911, the operator put out two calls to officers of the Hoover Police Department ("HPD"), the first of which alerted all officers to "be on the look out" ("BOLO") for an eighteen-wheeler driving erratically on I-65 North, and the second of which specifically dispatched Officer Nina Monosky and Officer Bruce Scarborough, another beat officer in the area, to locate the tractor trailer. (Monosky Depo., pp. 51, 53-54, 68-70; Doc. # 32, Exhibit 12). The second BOLO alerted officers that the driver of the eighteen-wheeler was driving erratically all over the road, had almost struck several vehicles, and was driving recklessly, and identified the truck as having a dark red cab with a white trailer bearing the name "Greentree Transportation" on it. (Monosky Depo., pp. 52, 55, 218; Scarborough Depo., p. 21; Doc. # 32, Exhibit 12, p. 1). During the second BOLO, the operator also indicated that a caller was following the suspect. (Monosky Depo., p. 55). At least one of the calls to 911 described the suspect vehicle as having a white - not maroon - cab. (Silas Depo., pp. 119-120, 108, Ex. 4). None of the Defendant Officers witnessed the truck actually driving on I-65 before it pulled onto the exit ramp. (Monosky Depo., p. 62, 176).

### B.    Initial Investigatory "Stop" of Plaintiff's Vehicle

When HPD officers arrived at the Alford Avenue exit where Duke was waiting with the suspect truck, Plaintiff had been stopped there for approximately five minutes. (Scarborough Depo., p. 30; Plaintiff Depo., p. 34). At that time, Plaintiff was in control of his vehicle, which was at a stop at the exit red light. (Plaintiff Depo., pp. 33-34; Exhibit 1, p. 82). Duke, who was still on the exit ramp after having followed the truck there, had gotten out of his vehicle to direct cars coming

onto the ramp away from the truck.  (Monosky Depo., pp. 55-57; Duke Aff., p. 2; Monosky Aff., p. 2).  Officer Monosky arrived first and approached Duke, who identified Plaintiff's truck as the truck that he had seen driving erratically on the highway.  (Duke Aff., p. 3).  Once the officers took over, Duke left the scene.  (Duke Aff., p. 3).

Based upon the tag number, name, description, and Duke's identification of the truck, the officers concluded that Plaintiff's truck was the one allegedly driving erratically.  (Monosky Aff.; Scarborough Aff.).  Although Plaintiff does not dispute that Duke called 911 to report an erratically driving truck, he disputes that he was, indeed, driving erratically.  According to Plaintiff, although he was somewhat anxious to find the location of the food bank, he was not aware of driving erratically, weaving, or any similar violation. (Plaintiff Aff.; Plaintiff Depo., pp 177-180).

Officer Scarborough spoke to Plaintiff first and asked him to turn off his engine. (Scarborough Depo., p. 30).  Scarborough also asked Plaintiff if he was taking any prescription medicine, and Plaintiff replied that he was not.  (Scarborough Depo., p. 32).   Scarborough then asked Plaintiff to move his truck to the Chevron gas station located approximately 50 to 75 yards away, and Scarborough blocked traffic to allow Plaintiff to move his truck.  (Scarborough Depo., p. 33).  While attempting to move his truck off the exit ramp to the Chevron station, Plaintiff tried three times - unsuccessfully - to crank his truck and, once he was able to start his engine, he then drove his truck over a curb. (Monosky Depo., pp. 78,  80).[4]  Finally, Plaintiff was able to move his

---

[4] According to Plaintiff, his truck stalled because it was loaded with canned goods and parked on an incline, and he avers that driving over a curb is a common occurrence that does not indicate impairment.  (Plaintiff Depo., p. 29; Lloyd Hampton report).  Nevertheless, he does not dispute that these events occurred.

6

vehicle into the gas station, and he parked it where he was instructed by Defendant Scarborough. (Scarborough Depo., pp. 31 -36).

According to Scarborough, Plaintiff's speech was slurred, his eyes were glossy, he looked tired, and he seemed disoriented.  (Scarborough Depo., pp. 41-42).[5]  When Plaintiff was asked by the officers to step out of his vehicle, he had trouble maintaining his balance as he walked, was very unsteady on his feet, and appeared very uncoordinated.  (Monosky Depo., p. 76; Scarborough Depo., pp. 43, 50; Doc. # 32, Exhibit 20).  As the officers were asking Plaintiff questions, he attempted to lean on his truck for support. (Monosky Depo., p. 76; Scarborough Depo., p. 44).

According to Plaintiff, who was seventy-three years old at the time of his arrest, arthritis in his left knee causes pain and an unsteadiness in his gait and requires that he work the stiffness out of his joints before he can walk to the best of his ability after sitting in one position for any length of time.  (Plaintiff Aff.).[6]  Plaintiff believes that his arthritis, which was exacerbated by sitting to drive for over an hour and moving trailers all morning, explains why his gait and balance were unsteady.  (Plaintiff Depo., pp. 26-28). Scarborough, however, interpreted Plaintiff's unsteadiness to be the result of being under the influence of some kind of medication.  (Scarborough Depo., pp. 41-42).

---

[5] Plaintiff disputes that his eyes were actually "glossy" looking, but he does not dispute that that was Scarborough's impression of him.  Plaintiff also disputes Officer Monosky's testimony that when she questioned Plaintiff on the scene, he would not respond and she would have to repeat her questions. (Monosky Depo., p. 75).

[6] Defendants point out, however, that Plaintiff's arthritis condition was not noted in his most recent driver-qualification medical examination, which the Department of Transportation requires of Plaintiff every two years due to his hypertension problem.  (Burd Aff., p. 3).

Plaintiff admits that at approximately 7:30 a.m. that morning, before he set out on his drive to Birmingham, he took his blood pressure medication Altace. (Plaintiff Depo., pp. 46-47, 218). Although Plaintiff is aware that the possible side effects of Altace include tiredness, feeling lightheaded and irregular heartbeat, he testified that, to his knowledge, he has never suffered any ill effects from that medication. (Plaintiff Depo. pp. 49, 85-89). At the time of his arrest, Plaintiff had been taking Altace for approximately four years and had never made a complaint about it to his doctor. (Plaintiff Depo., p. 49).

According to Plaintiff, Altace was the only medication that he had taken on the morning of his arrest. (Plaintiff Depo., pp. 45-48, Plaintiff Aff.). However, Plaintiff admits that he had both Altace and Ambien, a sleeping aid,[7] in his truck on the day of his arrest. (Plaintiff Depo., p. 83). At first, Plaintiff denied taking *any* medication at all that morning when Scarborough asked him whether he was under the influence of any medications. (Scarborough Depo., p. 32). But when Scarborough asked Plaintiff a second time if he was taking any medication, "he said yes, he was on blood pressure medication." (Scarborough Depo., pp. 38-39).[8] Plaintiff informed Defendant Scarborough that he had not been drinking. (Scarborough Depo., pp. 31-32). It is undisputed that

---

[7] According to Plaintiff, he was prescribed Ambien during his bereavement after the death of his mother. (Plaintiff Depo., p. 79).

[8] Scarborough also recalls that Plaintiff "volunteered that he was taking Ambien [generally]." (Scarborough Depo., pp. 38-39). Plaintiff disputes that he told Scarborough he had taken Ambien on the evening or morning before his arrest, and Scarborough's testimony is not helpful to resolve the matter: "[I] asked him then if he had had [Ambien] *that day* and I don't recall what he said because I looked over my right shoulder again and looked at Officer Monosky and I was distracted. So I really don't remember what he said." (Scarborough Depo., pp. 38-39) (emphasis added). The court has viewed the facts in the light most favorable to Plaintiff and will assume that Plaintiff never mentioned having taken Ambien on the day of his arrest to Officer Scarborough.

there was no odor of alcohol or marijuana in the vehicle or on Plaintiff's person, and his eyes were not bloodshot.  (Monosky Depo., pp. 75-76).

####    C.      Administration of Field Sobriety Tests

After Plaintiff's conversation with Defendant Scarborough, Defendant Monosky began to administer to him various field sobriety tests, including the one-legged stand test, the walk-and-turn test, and the Horizontal Gaze Nystagmus Test (the "HGN" test).  (Scarborough Depo., pp. 46-47; Plaintiff Depo., pp. 40-44; Monosky Depo., pp. 61-62, 90-91, 135).  At that time, Monosky was under the impression that a driver can refuse to submit to a field sobriety test without any consequences of which she is aware.  (Monosky Depo., p. 205).

The HGN test measures the involuntary jerking of the eyes  – a natural, normal phenomenon that is exaggerated by alcohol and other intoxicants. (Monosky Depo., pp. 90-91).  Indications of possible impairment during the HGN test are lack of smooth pursuit in either eye, distinct nystagmus at maximum deviation in the left eye and the right eye, as well as the onset of nystagmus prior to forty-five degrees in the left eye and in the right eye. (Monosky Depo., pp. 101-02).  Thus, the HGN test checks for equal tracking of the subject's eyes. (Monosky Depo., pp. 92-93).

The HGN test involves a series of steps whereby the subject is given instructions to watch the officer's finger while the officer watches his eyes. (Monosky Depo., p. 91). With the HGN test, the subject is told to stand still while the officer holds her finger approximately 12 inches away from the subject's eyes. (Monosky Depo., p. 92). The subject is instructed to follow her finger with his eyes only - not his head - until she tells him to stop. (Monosky Depo., p. 92). When the HGN test is administered, "[t]he subject should not face toward the blinking lights of a police cruiser or

passing cars, which may cause optokinetic nystagmus." (Doc. # 40, Exhibit U, p. 5).[9] "Optokinetic nystagmus is evident when an object that the eye fixates upon moves quickly out of sight or passes quicky through the field of vision, such as occurs when watching utility pools [sic] pass by while in a moving car." (Doc. # 40, Exhibit U, p. 20, note 39).[10]

Plaintiff believes that the HGN test was performed improperly because he was facing toward the direction of the interstate, and presumably passing cars, at the time the test was administered. (Monosky Depo., p. 96; Doc. # 40, Exhibit U, p. 5).  It is undisputed that at the time the HGN test was administered, Plaintiff was standing in the parking lot of the Chevron station, which is around the corner and 50 to 75 yards away from the exit ramp of the interstate. (See Monosky Depo., pp. 81, 90; Scarborough Depo., p. 32).

According to Defendant Monosky, Plaintiff was not able to perform the HGN test as instructed, even after she attempted to have Plaintiff perform it three times. (Monosky Depo., pp. 93-94; Plaintiff Depo., pp. 37-40). The first time Plaintiff stared straight ahead and did not follow Officer Monosky's finger with either his eyes or his head. (Monosky Depo., pp. 94-95).  During the second and third attempts to complete the HGN test, Plaintiff turned his head to follow Officer Monosky's finger, in direct contradiction to her instructions.  (Monosky Depo., p. 95).  According

_____

[9] This guideline for the HGN test, offered by Plaintiff as evidence in this case, was issued by the National Highway of Transportation Safety Administration ("NHTSA"). (Doc. # 40, Exhibit U, at 5).  Although Defendant contends that the NHTSA are inauthentic and inadmissible hearsay (*see* Doc. # 44, at 4), the court assumes, without deciding, that the NHTSA guidelines are properly considered as material, admissible evidence in this case.  *See also* discussion in footnote 2 *supra.*

[10] Although Plaintiff complains that Monosky did not perform the Vertical Gaze Nystagmus test (the "VGN" test), which is exclusively used to determine the presence of "drugs in the system" (Monosky Depo., pp. 225, 131), it is undisputed that the HGN test measures the involuntary jerking of the eyes – a natural, normal phenomenon that is exaggerated by alcohol and/or other intoxicants. (Monosky Depo., pp. 90-91).

to Plaintiff, he did eventually follow Monosky's instructions after another officer grabbed his head and told him to hold his head still.  (Plaintiff Depo., pp. 40-44).  Monosky testified that she "was not able to" see any nystagmus in Plaintiff's eyes because of his repeated miscues in performing the test correctly.  (Monosky Depo., p. 97).

During the one-legged stand test, the subject is instructed to stand with one leg raised and his arms down by his side and to stay in that position. (Monosky Depo., pp. 98-99). An officer looks for certain clues indicating impairment, including putting the raised foot back down, hopping on the other foot, swaying from side to side or front to back, and using arms to maintain balance. (Monosky Depo., pp. 100-01).  When performing this test, Plaintiff was able to raise one foot and count to one, but he then lost his balance and put his foot back down so he would not fall over. (Monosky Depo., p. 99; Scarborough Depo., p. 52).   Officer Monosky attempted to have Plaintiff perform the one-legged stand test three times, but he could not maintain his balance – he hopped, used his arms, and put his foot back down. (Monosky Depo., p. 100-02).  Plaintiff claims that his arthritis and stiff joints - not impairment - explain his balance problems during this test.  (Plaintiff Aff., p. 2).

Prior to administering the one-legged stand test, Officer Monosky asked Plaintiff if he had any problems with his legs, but she cannot recall his answer.  (Monosky Depo., p. 215).  Plaintiff avers that, in response to Monosky's question, he informed her that he had arthritis.  (Plaintiff Aff., p. 3). Officer Monosky admitted that a physical problem with a suspect's legs could affect the outcome of the test.  (Monosky Depo., pp. 215, 235-36)  However, she testified that she would not modify the test for a suspect's physical ailments because the testing procedure is standardized:

> Q:    Now, with regards to the one-legged stand test and walk and turn test that you gave to Plaintiff, if he had told you that he had problems with his legs, would you have still made him attempt for him to do those tests?

11

A:     I would have asked him to perform the test.

Q:     Are there any modifications to the tests, the walk and turn test or the one-legged test for people who may have problems with their limbs?

A:     Those tests are standardized regardless of any disabilities.

Q:     Can you take a disability into consideration when scorning on those tests?

A:     No. You can document that they have a disability, but as far as scoring goes, again, is standardized.

(Monosky Depo., pp. 235-36).

Officer Monosky also tried to perform the walk-and-turn test on Plaintiff. (Monosky Depo., pp. 102-03).   The walk-and-turn test has a mental component and is a "divided attention test" that involves counting out loud while concurrently maintaining balance and walking. (Monosky Depo., pp. 104-05). There are two clues of impairment during the instruction phase:  beginning the test before being told to do so and being unable to maintain balance during the instructions. (Monosky Depo., p. 105). Once the test begins, there are six clues that indicate impairment:  stepping off the line, not taking heel-to-toe steps, using arms to balance, stopping the test before it is completed to regain balance, not turning properly as instructed, and taking an incorrect number of steps. (Monosky Depo., pp. 105-16).  Maintaining balance is part of two of these indicators. (Monosky Depo., p. 106).

During the instruction phase of this test, Officer Monosky told Plaintiff to stand on a line with his left foot, to place his right foot in front of the left foot on the line with the heel of his right foot touching the toe of his left, to keep his arms down by his side, and to maintain that position until she tells him to begin. (Monosky Depo., pp. 103-04). After demonstrating how to perform the walk-and-turn test, Officer Monosky told Plaintiff to take nine steps down the line, turn around with one foot remaining on the line, and take nine steps back down the line. (Monosky Depo., pp.

12

104-05).   Officer Monosky observed that during the instruction phase of this test, Plaintiff had trouble maintaining his balance and could not stand as instructed. (Monosky Depo., pp. 107-08). During the test itself, Plaintiff used his arms to help him maintain balance, stepped off the imaginary line several times, did not complete the turn as instructed, and paused to step back on the line. (Monosky Depo., pp. 108, 110).   Once again, Plaintiff claims that his physical ailments - not impairment - explain his performance on this test.  (Plaintiff Aff.).

Based upon her observations above, Defendant Monosky determined that Plaintiff failed the sobriety tests.  (Monosky Depo., pp. 225-26).[11]  Plaintiff was arrested, handcuffed, and placed into Defendant Monosky's patrol vehicle.  (Monosky Depo., p. 112).   At the time of his arrest, Plaintiff was not combative, did not raise his voice, did not resist in any way, and was not disruptive or disorderly.  (Monosky Depo. 139-40).  He did, however, have difficulty walking to the patrol car, staggering and stumbling as if he might fall.  (Scarborough Depo., p. 55).

### D.     Search of Plaintiff's Vehicle

When the officers determined that Plaintiff would be arrested, Officer Scarborough called Greentree to see if the company had someone in the area to pick up his truck, which had to be moved for safety purposes. (Scarborough Depo., pp. 57-58; Burd Aff., p. 1; Scarborough Aff., p. 2). A Greentree representative informed Scarborough that the company did not have an alternate driver in the area to move Plaintiff's truck. (Scarborough Aff., p. 2). Thus, Scarborough determined that the truck would have to be towed and impounded. (Scarborough Aff., p. 2). Due to his experience

---

[11] Officers Monosky and Scarborough also testified that Monosky also asked Plaintiff to say the alphabet, which he could not do as he recited up to the letter "P," then skipped some letters, and then picked back up with the letter "W." (Monosky Depo., p. 110; Scarborough Depo., p. 52). Plaintiff, however, does not recall that this test was ever performed (Plaintiff Depo., p. 45), and the court has construed these facts in the light most favorable to him.

as an officer, Scarborough was aware that an eighteen-wheeler truck driver routinely lives in the cab of his truck, and he deduced that Plaintiff would likely have valuable items in his truck. (Scarborough Aff., pp. 2-3).

Pursuant to HPD policy, an inventory of the cab of Plaintiff's truck was to be completed as a routine procedure prior to impoundment. (Monosky Depo., p. 181; Holder Depo., pp. 50-53; Monosky Aff., p. 2; Scarborough Aff., pp. 2-3; Holder Aff., pp. 1-2; Doc. # 32, Exhibit 23, p. 2). The purpose of performing a pre-impoundment inventory of a vehicle is to secure any valuables inside in order to protect the owner from loss of property and to protect the police officers against allegations of misconduct, because valuables are at risk of being removed from impounded vehicles. (Monosky Depo., pp. 44-45; Holder Depo., p. 34; Holder Aff., p. 2; Doc. # 32, Exhibit 23, p. 2). The City's policy governing inventory searches, which is contained in its Standard Operating Procedures, provides:

> It is the standard procedure of the Hoover Police Department to inventory all vehicles towed on the order of an officer of this Department. This procedure has been implemented to protect the property of vehicle operators against loss and to protect the police officers of the City of Hoover, Alabama, against claims of misconduct in the protection of that property.  Each vehicle shall be inventoried by an officer at the scene prior to its removal.  However, in case where  the vehicle is protected pending the obtaining of a search warrant (as in felony arrests, criminal investigation, or other extenuating circumstances) said vehicle may be searched at a later time by Technical Services Crime Scene Investigators.  After the inventory is completed, the vehicle and its contents shall be secured and the key turned over to the wrecker driver.
>
> NOTE: In any case where a search warrant may be sought, an investigator or Crime Scene Investigator shall be consulted before beginning an inventory.

(Doc. # 40, Exhibit L, p. 2, Section F).   As the language of the policy indicates, it does not provide step-by-step instructions regarding how an inventory should be conducted, nor does it specify whether an officer can open the glove compartment or a container such as a backpack which is

located in the car.  (Monosky Depo., pp. 182-183; Holder Depo. p. 51; Doc. # 40, Exhibit L, section F).

Nevertheless, certain routine procedures are followed by HPD officers performing an inventory.  First, the officers survey the vehicle for any valuable items the arrestee cannot personally take with him or her.  (Scarborough Depo., p. 63).  Inspection of the contents of containers holding pills is routine (Scarborough Depo., p. 99), and it is customary to remove any loose pills found during the inventory in order to determine what they are (Holder Depo., p. 63).  Per HPD policy, Poison Control must be contacted to identify all pills. (Scarborough Depo., p. 99; Monosky Aff., p. 3).

After Plaintiff was arrested and placed in the patrol vehicle, Defendant Officer David Holder arrived while Defendant Monosky was "filling out forms" (Holder Depo., p. 25), which included filling in the top portion of the Towed Vehicle Report (Monosky Depo., pp. 35-36, 137).   While Monosky completed paperwork, Defendant Holder performed the inventory of the cab of Plaintiff's truck.  (Holder Depo., p. 25; Monosky Depo., pp. 45-46; Monosky Aff., p. 2; Scarborough Aff., p. 3; Holder Aff., p. 2).  The interior of Plaintiff's cab appeared "well lived in" and included a bed and a small refrigerator. (Holder Depo., pp. 26-27). To perform the inventory, Officer Holder climbed into the truck and visually inspected the cab for loose valuables. (Holder Depo., pp. 27, 60; Holder Aff., p. 2).  He found a briefcase, assorted paperwork, a cell phone, and clothing. (Holder Depo., pp. 27-29; *see also* Doc. # 40, Exhibit S).

Officer Holder also discovered medication on an open shelf at eye level in the bedroom area. (Holder Depo., p. 31).  Specifically, he found a daily medication dispenser and a little Bayer aspirin bottle, which was found to contain thirteen Ambien pills.  (Monosky Depo., pp. 46-49; Holder

15

Depo., pp. 31-32; Holder Aff., p. 2; Doc. # 32, Exhibit 13, p. 1).[12]  According to Monosky, the officers believed upon finding the aspirin bottle and the daily dispenser that they might contain contraband.  (Monosky Aff., pp. 2-3).  It is undisputed that Officer Holder did not open the sealed briefcase which was identified in the truck. (Holder Depo., p. 60).  The medication bottles were the only items removed from the truck.  (Monosky Depo., pp. 222-23).

According to Plaintiff, a prescription bottle for Ambien was on the same shelf. (Plaintiff Depo., pp. 83-84,121).  Officer Holder testified that he does not recall seeing a prescription bottle for Ambien on the shelf, nor was it among other pill bottles retrieved[13] from the cab of the truck. (Holder Depo., pp. 32, 60; Monosky Aff., p. 3; Holder Aff., p. 3).  Plaintiff testified that the police officers did not find his prescription bottle for Ambien because it had "fallen behind" some things.

---

[12] Defendant Monosky actually opened the aspirin bottle, in which Defendant Holder recognized Ambien pills.  (Holder Depo., pp. 33, 63).  Poison Control and the Alabama Department of Forensics later confirmed that the thirteen tablets were Ambien, a Class-IV controlled substance.

[13] Although Officer Monosky actually retrieved the medications from the truck, she only took the medications already identified by Officer Holder and did not "look around" herself.  (Monosky Depo., pp. 144-46).

(Plaintiff Depo., p. 121).[14]  Plaintiff avers that he found the prescription bottle when he emptied the compartment out after being released from jail after his arrest. (Plaintiff Depo., p. 121).

      Defendant Holder then completed the narrative section of the Towed Vehicle Report, listing that he found "briefcase . . . cell phone . . .[and] assorted clothing." (Holder Depo., pp. 28-29; Doc. # 40, Exhibit S).  Officer Monosky then removed the medication from the vehicle, pursuant to standard procedure, so that Plaintiff could have access to needed medications in jail and so that the medications could be identified.  (Holder Depo., pp. 62-63; Monosky Depo. pp. 144-46).[15]  After finding the medication, neither Monosky nor Holder asked Plaintiff if he had a prescription for the medication found in his truck.  (Holder Depo., p. 36).  According to the Defendants, Plaintiff appeared to be passed out in the back of Officer Monosky's truck so that they were unable to inquire about the medication. (Monosky Depo., p. 147).

      Plaintiff's expert in police procedures, Dr. Michael Lyman opined that, "the search conducted by Officer Holder was not a proper inventory search and, in fact, the opening of the aspirin bottle

---

[14] Plaintiff testified:

> A:    That particular day they did not find it, because when they went through the truck, it fell behind – there was some stuff in there and it was laying behind there.  It was – I just reached in there and emptied the whole thing, and there was the bottle.

> Q:    Okay. So had the bottle that showed the prescription for it had fallen behind the compartment?

> A:    No.  It fell – it was in the compartment, but it had fallen behind whatever was in there.

(Plaintiff Depo., p. 121).

[15] It is undisputed, however, that Plaintiff was not given any medication while in the custody of the City. (Plaintiff Aff.).

containing the 13 Ambien pills was more consistent with a search for evidence than an inventory search, and, therefore, should have been pursuant to a search warrant." (Lyman Depo. p. 61).

**E.     Relocation to the Jail and Arrest for Possession of Controlled Substance**

After the inventory was completed, Defendant Monosky transported Plaintiff to the HPD and Hoover City Jail. (Monosky Depo., pp. 145-47).  She also transported the medications that had been found in Plaintiff's vehicle. (Monosky Depo., pp. 146-47).  Upon arrival at the jail, Plaintiff was instructed to sit on a bench in front of the booking desk, while Defendant Monosky called Poison Control to inquire about the medication. (Monosky Depo., p. 151).  Plaintiff testified that he informed several officers at the jail that he had a prescription for the Ambien and could phone his doctor or pharmacy to confirm that prescription. (Plaintiff Depo., pp. 117-119).

After a telephone call to a detective, Monosky began filling out paperwork to document Plaintiff's arrest. (Monosky Depo., 157-58).  She believes that Plaintiff had been released from restraints at this point and does not remember him being disruptive or resisting in any fashion. (Monosky Depo., pp. 158-59). Plaintiff's Arrest Report was filled out primarily by Defendant Monosky, who indicated in the narrative portion of the Report that Plaintiff's speech was slurred (Arrest Report, p. 2), which was consistent with her observations and the observations of  Officer Scarborough (Scarborough Depo., pp. 41-42; Monosky Depo., pp. 78, 223-224).  However, the "suspect description" section of the Arrest Report, which was filled out by another officer who has yet to be identified, included a box checked that Plaintiff's speech was "normal," not "slurred." (Monosky Depo., pp. 121-125; Arrest Report).  Both the Official Notice of Intent to Suspend Driving Privileges and Affidavit and the Alabama Uniform Incident/Offense Report  reflect that Plaintiff's speech was slurred.  (See Doc. # 32, Exhibit 20; Doc. # 32, Exhibit 11, p. 2).

The Arrest Report contained the charges of misdemeanor driving under the influence of any substance in violation of Alabama Code § 32-5A-191(a)(5), and felony unlawful possession of a controlled substance in violation of Alabama Code § 13A-12-212. (Monosky Depo., p. 121; Arrest Report). According to Officer Monosky, she determined at the scene of the arrest to charge Plaintiff with driving under the influence. (See Monosky Depo., p. 157; Arrest Report, p. 1). Plaintiff was charged with felony possession after they arrived at the station and after Monosky provided information to a detective about the Ambien discovered in the truck, who then instructed her to charge him with the felony. (Monosky Depo., pp. 151-57). Officer Monosky testified that it is within her discretion to determine whether, on an unlawful possession of a controlled substance charge, she will allow an arrestee to make follow up phone calls on a missing prescription. (Monosky Depo., p. 230).

F.      Administration of Breathalyzer Test

Upon being informed of the charges, Plaintiff demanded a "sobriety test, drug and blood test, and a urine analysis." (Plaintiff Depo., pp. 55-61). Plaintiff was given a Draeger Intoxilizer Test ("breathalyzer test"), which resulted in a 0.00 blood alcohol level. (Doc. # 40, Exhibit M).

After submitting to the breathalyzer test, Plaintiff again requested a blood test or urinalysis:

After the results of my breathalyzer test I requested a blood test or a urine analysis to prove that I was not on any other substances . . . . Having undergone many random drug and alcohol screenings during my employment as a truck driver, I was well aware of the procedure at the time of my arrest, and wished to prove my innocence. Despite my having requested a blood test and a urinalysis several times while in the custody of the Hoover jail, I was denied this opportunity.

(Plaintiff Aff., ¶ 11; *see also* Plaintiff Depo., pp. 55-62). Officer Monosky testified that she did not hear Plaintiff request an alternative test. (Monosky Depo., p. 169). Plaintiff testified that he asked

19

the "desk sergeant" and/or Officer Scarborough for a urine test. (Plaintiff Depo., pp. 58-60). According to Plaintiff, an unidentified officer behind the desk at the jail informed him that the breath alcohol test was the only test that "was required." (Plaintiff Depo., pp. 62). Defendant Monosky is aware that the law requires a suspect to be given a "reasonable opportunity" to have alternative chemical tests performed after the suspect submits to an officer-directed test. (Monosky Depo. pp. 203-204). Defendant Holder is similarly aware that a suspect can obtain a blood test at his own cost after submitting to one at an officer's discretion. (Holder Depo., p. 53).

Defendant Monosky "believes" that she filled out the Arrest Report listing both charges at the same time. (Monosky Depo., p. 157). Plaintiff was given the breathalyzer either while she was on the phone with the detective or while she was filling out his Arrest Report charging him with driving under the influence of any substance. (Monosky Depo., p. 163-65). Monosky testified that she went to fill "out" paperwork shortly after the breathalyzer test. (*See* Monosky Depo., p. 169). The results of the breath alcohol test list the testing time as 11:55:17 AM. (Doc. # 40, Exhibit M). Officer Monosky acknowledged to HPD dispatch that she had completed an arrest report, and she was back in service at 13:19:08. (Silas Depo., p. 62).

### G.   Overnight Detention and Later Release

Plaintiff was held in the Hoover jail overnight, and he was not allowed a telephone call until the following morning. (Plaintiff Depo. p. 70-76). When Plaintiff was eventually allowed to use the telephone, he used it to post bond**.** (Plaintiff Depo., pp. 75-76; Doc. # 32, Exhibit 24). Because Plaintiff had been charged with a felony, he was released into the custody of the Jefferson County Sheriff's Department during mid-afternoon of the following day. (Plaintiff Depo., pp. 70-71, 76; Arrest Report, p. 2). He was released from the County's custody at approximately 9:30 PM.

(Plaintiff Depo., p. 71).  After being released from custody, Plaintiff recovered his truck and spent the night at a truck stop in his vehicle.  (Plaintiff Depo. 73).

The following morning, Plaintiff picked up his dog from the vet where it had been kept during his incarceration, and he went back to HPD headquarters.  (Plaintiff Depo., pp. 91-92).  When he arrived, Plaintiff requested to speak with Defendant Scarborough, waited for him to arrive, and presented him with the prescription bottle as "proof" that he was not illegally in possession of the Ambien. (Plaintiff Depo., pp. 92-93).  Although Plaintiff assumed that the officers who arrested him believed that he was under the influence of Ambien while driving, he did not seek an independent drug test upon his release from jail because he understands that Ambien only remains detectable in one's body for approximately ten hours after ingestion. (Plaintiff Aff., p. 3). Since he had been in custody more than twenty-four hours since the time of his arrest, Plaintiff felt that it would do him no good at that point to go to a hospital for a urinalysis or blood test.  (Plaintiff Aff., p. 3).

### H. The Termination of Plaintiff's Employment and Later Dismissal of Criminal Charges

After returning home to South Carolina, Plaintiff contacted Kenneth Slafka, the president of Greentree to discuss the charges.  (Plaintiff Depo., p. 96-97).  Mr. Slafka informed Plaintiff that because he had been charged with the above-referenced offenses, he could not work for Greentree. (Plaintiff Depo., p. 97).  Specifically, he could not work with Greentree because, "the charges were something that the insurance company would not let him carry."  (Plaintiff Depo., p. 97).

At the time of his arrest on November 3, 2005, Plaintiff had maintained a Commercial Drivers License for approximately fifty years, had never been in an accident, and had received only

one traffic violation for speeding.  (Plaintiff Depo.,  pp. 14, 170).  Just prior to his arrest, Plaintiff

had received an award from Greentree for ten years of safe driving.  (Doc. # 40, Exhibit Q).

The charge of unlawful possession of a controlled substance against Plaintiff was dismissed

on or about February 22, 2006, and the driving under the influence charge was dismissed "on the

ground that there is insufficient evidence to proceed to trial" on or about March 29, 2006. (Doc. #

40, Exhibit T).

## I.      Plaintiff's Claims

Plaintiff's Amended Complaint alleges the following claims:

(1)     unreasonable search and seizure in violation of federal law (the Fourth and
        Fourteenth Amendments[16]) and pursuant to 42 U.S.C. § 1983 against the City
        and all four individual defendants (Count One);

(2)     false arrest and false imprisonment  in violation of federal and Alabama state
        law (including detaining Plaintiff after a breathalyzer test demonstrated no
        intoxication and refusing to allow Plaintiff to arrange for an independent
        blood test) against the City and all four individual defendants (Count Two);

(3)     excessive force in violation of federal law (the Fourth and Fourteenth
        Amendments which prohibit the use of any force because his arrest was
        unlawful) and pursuant to 42 U.S.C. § 1983 against Defendants Monosky and
        Holder (Count Three);

(4)     tortious interference with contract against the City and Officers Scarborough
        and Derzis (Count Four);

(5)     tortious interference with business relations against the City and all four
        individual defendants (Count Five);

(6)     malicious prosecution against the City and all four individual defendants
        based upon subsequent prosecution of both charges against him despite his

--------------------------------------------------

[16] Plaintiff only asserts a substantive violation of his *Fourth* Amendment rights, citing the
Fourteenth Amendment merely as the vehicle through which the Supreme Court has applied Fourth
Amendment protection from state action.

negative alcohol test and valid medical prescription for the controlled substance (Count Six);

(7)     negligent hiring, training, supervision and/or retention against the City and Officer Derzis based upon the employment of Officers Monosky, Scarborough, and Holder (Count Seven); and

(8)     assault and battery against the City, Chief Derzis, and Officers Monosky and Holder based upon physical restraint and handcuffs (Count Eight).

(Doc. # 13-2).[17]

## III.    Abandoned Claims

As an initial matter, the court finds that Defendants are due summary judgment on the following claims, which Plaintiff has abandoned: (1) excessive force (Count Three); (2) tortious interference with contract (Count Four); (3) tortious interference with business relations (Count Five); (4) negligent hiring, training, supervision and/or retention (Count Seven); and (5) assault and battery (Count Eight).  Plaintiff's brief in opposition fails to even mention these counts, much less set forth any specific facts showing a genuine issue for trial with respect to these claims. (*Compare* Doc. # 33 *with* Doc. # 35).  Moreover, although Plaintiff's Amended Complaint levies all but one of the original eight counts against individual defendant Police Chief Derzis and the municipality defendant, the City (*see* Doc. # 13-2 (omitting those Defendants from Count Three only)), Plaintiff's opposition brief narrows his claim against those two Defendants to one claim based upon failure to promulgate a proper policy governing inventory searches and/or "blessing" the allegedly improper inventory search of Defendant's truck on the day of his arrest (Doc. # 35, at 14-16).

_____

[17] As noted in footnote 1, *supra*, the court will not revisit the injunctive relief sought by Plaintiff in Count IX of both complaints because that claim was dismissed by the court prior to the filing of Plaintiff's Amended Complaint.  (Doc. # 8).

"[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Edmondson v. Board of Trustees of University of Alabama,* 258 Fed.Appx. 250, 253 (11th Cir. 2007)(*citing Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995))("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . . Here, [plaintiff] did not respond to [defendant's] motion for summary judgment on the Equal Protection Act claim. Therefore, she has abandoned it."); *see also Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd,* 44 F.3d 1008 (11th Cir. 1995)("Summary Judgment is appropriate since plaintiff failed to respond to [defendant's] argument on this issue.")(citations omitted).

Accordingly, the only remaining claims in this case to be considered by the court in its summary judgment analysis lie in Counts One, Two, and Six of Plaintiff's Amended Complaint: (1) unreasonable search and seizure in violation of the Fourth Amendment, through the Fourteenth Amendment, and pursuant to 42 U.S.C. § 1983 (Count One);  (2) false arrest/false imprisonment in violation of federal and Alabama state law,[18] which includes detaining Plaintiff after a breathalyzer test demonstrated no intoxication and refusing to allow Plaintiff to arrange for an independent blood

---

[18] Plaintiff's state law claims of false arrest and false imprisonment arise under the same Alabama statute and follow the same analysis. *See* Ala.Code § 6-5-170 ("False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty."); *Upshaw v. McArdle,* 650 So.2d 875, 878 (Ala.1994)(holding that a wrongful or false arrest will support a claim for false imprisonment).

test)(Count Two); and (3) malicious prosecution in violation of federal[19] and Alabama state law based upon subsequent prosecution of both charges against Plaintiff despite his negative alcohol test and valid medical prescription for the controlled substance (Count Six). (Doc. # 13-2).

Although each of those three claims was pled in the Amended Complaint against the City and all four individual defendants in their individual capacities, the only remaining claim against Chief Derzis and the City is, as the court noted above, based upon the alleged failure to promulgate a proper policy governing inventory searches and/or "blessing" the allegedly improper inventory search of Defendant's truck on the day of his arrest. (Doc. # 35, at 14-16; Doc. # 13-2, Count One). It is undisputed that neither the City nor Chief Derzis was directly involved in the search of Plaintiff's vehicle, but instead – according to Plaintiff – are liable only by the implementation of a policy or the sanctioning of the other officers' conduct. (Doc. # 35, at 14-16)  Therefore, the court's analysis of the remaining claim against them is unique and will be examined separately from the

---

[19] The court rejects Defendants' suggestion that Plaintiff's malicious prosecution claim was only asserted under state law because Count Six "does not reference Section 1983 in any way." (Doc. # 42, at 16). Plaintiff's opposition to summary judgment makes clear that he does assert a malicious prosecution claim under § 1983 (Doc. # 35, at 24-27), and the absence of citation to § 1983 in the few paragraphs of the Amended Complaint outlining that particular claim does not pretermit such a claim. Count Six does not reference state law either, much less limit the legal basis for the malicious prosecution claim to state law alone. (Doc. # 13-2, at 12-13). It is clear that Plaintiff's malicious prosecution claim has a practicable federal basis – this Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). And the detailed allegations of malicious prosecution contained in Plaintiff's Amended Complaint are certainly sufficient to satisfy even a heightened pleading standard under § 1983. (*See* generally Doc. # 13-2). Given the particularity of Plaintiff's allegations, the invocation of § 1983 and the Fourth Amendment throughout Plaintiff's complaint, and the absence of limitation of Count Six to state law, the court finds that Plaintiff's malicious prosecution allegations "are sufficient to toll the constitutional bell" even without direct citation to § 1983 or the Fourth Amendment in that particular count of the complaint. *Reeves v. City of Jackson*, 532 F.2d 491, 494 (5th Cir. 1976).

claims against the other three officers - Scarborough, Holder, and Monosky - who did interact with Plaintiff directly.

As to the federal claims against those three officers in their individual capacities, which constitutes the bulk of Plaintiff's argument in opposition to summary judgment, they have all raised the defense of qualified immunity. The court's analysis will begin there, before moving to the state law claims against those three defendants, and concluding with the remaining claim against the City and Chief Derzis.

**IV.     Federal Claims Against Officers Scarborough, Holder, and Monosky**

Plaintiff has alleged that Officers Scarborough, Holder, and Monosky violated federal law by taking the following actions against him, in chronological order: (1) investigating and arresting him for misdemeanor driving under the influence; (2) searching his vehicle; (3) arresting him, and then continuing to detain him, on the felony charge of possession of a controlled substance; (4) continuing to detain him on the driving under the influence charge; and (5) continuing to prosecute him on both charges.  In this Circuit, all of those claims are properly analyzed under the Fourth Amendment, which guards against unlawful arrest and detainment, unlawful search and seizure, and malicious prosecution. *See Durruthy v. Pastor*, 351 F.3d 1080, 1093 (11th Cir. 2003); *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003).

Before moving to the substantive constitutional analysis, the court must determine, as a threshold matter, which of the three officer defendants may be held liable for which of the above-referenced actions.  The Amended Complaint offers no assistance in this inquiry, as it adopts a "all but the kitchen sink" approach by charging all of the remaining defendants with having participated in all five of those allegedly unconstitutional actions.  (Doc. # 13-2, Counts One, Two, and Six).  But

26

contrary to those panoptic complaint allegations, the undisputed evidence in the summary judgment record simply does not implicate all three officers in all five of the acts about which Plaintiff complains.  Accordingly, the court turns to the statutory language of § 1983 and the interpretive law of this Circuit to determine what standard of liability must be applied.

"Section 1983 requires proof of an affirmative causal link between the official's acts or omissions and the alleged constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986); *see also Brannon v. Thomas County Jail,* 280 Fed.Appx. 930, 933 (11th Cir. 2008).  The statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... *subjects, or causes to be subjected,* any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added); *see also Williams v. Bennett,* 689 F.2d 1370, 1380  (11th Cir. 1982)("The italicized language plainly requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation.").  Thus, in establishing § 1983 liability, a plaintiff cannot rely on theories of vicarious liability or *respondeat superior.  Cook ex. rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115-16 (11th Cir. 2005).  Instead, "[t]he causal connection may be proven by showing that the official (1) was personally involved in the acts or omissions that resulted in the constitutional deprivation; (2) established a policy or custom that resulted in the constitutional deprivation; or (3) breached a duty imposed by state or local law." *Brannon v. Thomas County Jail*,

280 Fed.Appx. 930, 933 (11th Cir. 2008)(citing *Zatler*, 802 F.2d at 401).[20]   "[I]t is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation."  *Williams*, 689 F.2d at 1380; *see also Lloyd v. Van Tassell,*  2009 WL 179622, at * 4 (11th Cir. 2009) (citing *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) and stating that "[i]n order to prevail on the merits in a § 1983 action against a defendant in his individual capacity, the plaintiff generally must show that he was personally involved in acts or omissions that resulted in the constitutional deprivation").

Applying this standard to the undisputed facts of this case, the evidence shows an affirmative causal connection between the particular officers and alleged constitutional deprivations outlined below:

> (1)    only Officers Scarborough and Monosky were even present during the investigation and Plaintiff's arrest for misdemeanor driving under the influence, as Officer Holder did not arrive until after the arrest was effectuated (Holder Depo. p. 25; Monosky Depo. pp. 55-57, 76, 112, 157; Scarborough Depo. p. 30; Monosky Aff.; Scarborough Aff; Holder Aff.);

---

[20] The court observes that, when a supervisor is involved, "a causal connection is established when: (1) the supervisor was on notice, by a history of widespread abuse, of the need to correct a practice that led to the alleged deprivation, and he failed to do so; (2) the supervisor's policy or custom resulted in deliberate indifference; (3) the supervisor directed the subordinate to act unlawfully; or (4) the supervisor knew the subordinate would act unlawfully and failed to stop the unlawful action."  *Lloyd v. Van Tassell,*  2009 WL 179622, at * 4 (11th Cir. 2009)(citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)(holding that a supervisor may be individually liable under § 1983 only when "the supervisor personally participates in the alleged unconstitutional conduct" or "there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation").  This analysis will be applied in the court's later discussion of the claim against Officer Derzis.  *See* discussion Section VI, *infra.* However, this analysis is not applicable to the claims against Officers Scarborough, Holder, and Monosky, as there is no evidence that a supervisory relationship existed between them.

(2)     only Officers Monosky and Holder were involved in the inventory search of Plaintiff's vehicle (Holder Depo. p. 25; Monosky Depo. pp. 45-46; Scarborough Aff.; Monosky Aff.; Holder Aff.);

(3)     only Officers Holder and Monosky discovered the presence of a controlled substance in Plaintiff's vehicle, made the decision to arrest Plaintiff for felony drug possession, and/or continued to detain Plaintiff therefore (Monosky Depo. pp. 151-57; Holder Aff.);

(4)     only Officers Monosky and Scarborough were involved in the continued detention of Plaintiff on the driving under the influence charge (Plaintiff Depo. pp. 55-62; Monosky Depo. pp. 163-69, 203-04; Holder Aff.); and

(5)     all three officers were involved in the continued prosecution of the claims against him.

From this point forward, the court's analysis of Plaintiff's claims will assume that only the above-referenced defendants and claims are before the court.

As noted earlier, Scarborough, Holder, and Monosky all have raised the affirmative defense of qualified immunity as to the claims against them, which is a defense designed to greatly limit litigation against police officers (and other state actors) in their individual capacities. The court will first outline the parameters of the defense before delving into a substantive analysis of each of the five federal claims outlined above.

**A.     The Defense of Qualified Immunity**

The purpose of qualified immunity is "to ensure that before they are subjected to suit, [police] officers are on notice [that] their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Therefore, "the salient question . . . is whether the state of the law [at the time of the events in question] gave [the officer] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (*quoting Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Indeed, the defense is so broad that only those

29

officers who are "plainly incompetent and those who knowingly violate the law" are required to defend against individual liability claims. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998). The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994).

To be entitled to qualified immunity, a defendant must establish "that he [] acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).[21] Once this is proven – and no one disputes that each individual defendant in this case was acting within his or her discretionary authority – the burden shifts to Plaintiff to show that qualified immunity is not applicable. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

"In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was 'clearly established' at the time he did it." *Crosby*, 394 F.3d at 1332 (citation omitted). "The threshold inquiry is whether plaintiff's assertions, if true, establish a constitutional violation." *Hope*, 536 U.S. at 736. If the court determines that the plaintiff

---

[21] The term 'discretionary authority' includes all acts of a governmental official that are (1) undertaken pursuant to the performance of official duties, and (2) within the scope of the official's authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). It is undisputed that, during the events in question, all of the defendants were acting in the capacity of police officers. Therefore, all of the acts at issue in this lawsuit were within the scope of discretionary authority, and Defendants have established this penultimate showing.

has not alleged a deprivation of a constitutional right, then the inquiry ends. *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998).

However, if the court determines that the plaintiff has, in fact, alleged a deprivation of a constitutional right, then further inquiry is needed as to "whether that right allegedly implicated was clearly established at the time of the events in question." *Lewis*, 523 U.S. at 841 n. 5. "Clearly established" rights must be "developed [] in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[22] "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them. A principle of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.'" *Holloman*, 370 F.3d at 1277 (*quoting United States v. Lanier*, 520 U.S. 259, 269 (1977); and *Hope*,

---

[22] To be sure, there is a temporal requirement related to this inquiry. A plaintiff must show that a reasonable public officer would not have believed his actions to be lawful in light of law that was clearly established *at the time* of the purported violation. *Anderson*, 483 U.S. at 641; *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

536 U.S. at 741).[23]  Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this Circuit.  *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

With that backdrop of applicable standards, the court now turns its attention to the question of whether the officers are due the protection of qualified immunity as to the claims against them. The court's analysis necessarily begins with the question of whether any of Plaintiff's five claims, which will be considered in chronological order, allege the deprivation of a constitutional right.

**B.      Investigation and Arrest of Plaintiff for Driving under the Influence**

Plaintiff first claims that Defendants Monosky and Scarborough[24] violated the Fourth Amendment by investigating, and then arresting, him for the misdemeanor offense of driving under the influence of "any substance which impairs the mental or physical faculties of such person to a degree which renders him [] incapable of safely driving," which is a violation of Alabama Code §

---

[23] As the Eleventh Circuit has explained:

> The Supreme Court, in *Hope*, cautions against a "rigid gloss on the qualified immunity standard" that would require materially similar, preexisting cases in all circumstances when the qualified immunity defense is to be overcome. *Hope*, 122 S.Ct. at 2512. Such a "rigid gloss" would be in variance with the law of the Supreme Court and the law of this Circuit. We have denied qualified immunity in the absence of precedents with similar facts. We have said, in the context of excessive force cases, that an official's conduct could run so afoul of constitutional protections that fair warning was present even when particularized caselaw was absent: "the official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Priester*, 208 F.3d at 926 (internal quotation marks omitted and second alteration in original).

*Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).

[24] As noted earlier, the undisputed facts indicate that only Officers Scarborough and Monosky were causally connected to the investigation and arrest of Plaintiff for driving under the influence. *See* discussion in the introduction to Section IV, *supra*.

32-5A-191(a)(5).  An individual has a federally protected right to be free from unlawful arrest and detention resulting in a significant restraint of liberty, and violation of this right may be grounds for suit under § 1983.  *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990). An arrest is unlawful if it is not supported by probable cause.  *Lowe v. Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992). "Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Durruthy*, 351 F.3d at 1088. By the same token, the existence of probable cause at the time of arrest constitutes an absolute bar to a § 1983 action for false arrest. *Marx v. Gumbinner*, 905 F.2d 1503, 1505-06 (11th Cir. 1990).

### 1.    Law Regarding the Establishment of Probable Cause Generally

Probable cause exists if an arrest is "objectively reasonable based on the totality of the circumstances." *Wood*, 323 F.3d at 878  (internal quotations omitted).  Probable cause exists when police have, at the moment of arrest, knowledge of facts and circumstances grounded in "reasonably trustworthy information" and sufficient in themselves to warrant a belief by a "prudent person" that an offense has been committed or is being committed by the person to be arrested. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Pickens v. Hollowell*, 59 F.3d 1203, 1205 (11th Cir. 1995); *Wood*, 323 F.3d at 878.  Notably, although probable cause requires more than suspicion, it "does not require convincing proof, *and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction*." *Wood*, 323 F.3d at 878 (internal quotations omitted)(emphasis added).

When qualified immunity is at stake, like it is here, a court measures probable cause using a slightly different perspective from that governing, for example, a motion to suppress in a typical criminal case. *See Von Stein*, 904 F.2d at 578-79 (observing that "intertwined with the question of

probable cause is the issue of qualified immunity"). The Eleventh Circuit has decreed that, for purposes of analyzing qualified immunity, "*arguable* probable cause . . . a more lenient standard than probable cause," is the more appropriate inquiry. *Knight v. Jacobson,* 300 F.3d 1272, 1274 (11th Cir. 2002) (emphasis added); *see also Crosby*, 394 F.3d at 1332-33; *Wood*, 323 F. 3d at 878 .  Arguable probable cause means: "if, under all of the facts and circumstances, an officer reasonably could - not necessarily would - have believed that probable cause was present." *Crosby*, 394 F.3d at 1332-33; *see also Scarborough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (defining arguable probable cause as when "reasonable officers in the same circumstances and possessing the same knowledge as the defendants could have believed that probable cause existed to arrest the plaintiffs").  "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Wood*, 323 F.3d at 878 (internal quotations omitted).  Thus, so long as there is *arguable* probable cause, qualified immunity applies even if *actual* probable cause did not exist.

A corollary to the concept of arguable probable cause is that an arresting officer must conduct a reasonable investigation before instituting an arrest. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)(citing *Harris v. Lewis State Bank*, 482 So.2d 1378, 1382 (Fla.1st DCA 1986) ("Where it would appear to a 'cautious man' that further investigation is justified before instituting a proceeding, liability may attach for failure to do so, especially where the information is readily obtainable, or where the accused points out the sources of the information.")).  In other words, "'a police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1228 (11th Cir. 2004) (quoting *Sevigny v. Dicksey*, 846 F.2d 953, 957 n.5 (4th Cir. 1988) and *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)); *see also Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (finding no probable cause

34

where arresting officer relied on unsubstantiated informant's tip, failed to take any independent steps to investigate the tip, and did not have any evidence which would have corroborated the tip)).

Thus, for the qualified immunity analysis, an officer is charged with possessing all of the information *reasonably discoverable* by an officer acting reasonably under the circumstances. *Kingsland*, 382 F.3d at 1228. It is true that an officer is not required to "perform error-free investigations or independently investigate every proffered claim of innocence," nor is an officer "'required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.'" *Kingsland*, 382 F.3d at 1229 and n.10 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)). However, an officer "may not choose to ignore information that has been offered to him or her, conduct a biased or selective investigation, or elect not to obtain easily discoverable facts." *Kingsland*, 382 F.3d at 1229.

The court now turns to the matter of whether the Defendants Scarborough and Monosky had probable cause - or at the least, arguable probable cause - to investigate and then arrest Plaintiff for the charge of driving under the influence.

## 2.      Initial Investigatory "Stop" for Driving Under the Influence

Plaintiff alleges that, from the very outset and even before he was arrested, Defendants violated the Fourth Amendment by initially detaining him for investigation after encountering him on the exit ramp. The law is clear that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). Although it is undisputed that Plaintiff's vehicle was technically already "stopped" on the exit ramp when the Defendant Officers arrived on the scene, the officers directed

35

Plaintiff to move his vehicle off the exit ramp and to a gas station for additional questioning and investigation.  It is this initial detainment that Plaintiff claims was an unlawful seizure in violation of the Fourth Amendment.

The Supreme Court has held that a police officer may order an "investigatory stop" of a suspect if the officer has "reasonable suspicion" that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In this Circuit, an officer may conduct a temporary, investigatory stop of the kind authorized by *Terry* so long as such a stop is justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct.  *United States v. Smith*, 799 F.2d 704, 707 (11th Cir. 1986). Reasonable suspicion requires considerably less of a showing than probable cause. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The court has reviewed the facts known to the officers at the time they initially detained Plaintiff at the gas station and finds that the officers possessed knowledge of specific, articulable facts that could give rise to reasonable suspicion of criminal conduct.  The undisputed facts indicate that Plaintiff was investigated by the Defendant Officers after the City of Hoover 911 operator received multiple phone calls from concerned citizens regarding erratic driving by a truck bearing a strong resemblance to Plaintiff's eighteen-wheeler.  An eyewitness called 911 at least twice to report the truck's erratic driving, and he gave the operator a description of the truck, the name on the trailer, the tag number, and what mile marker he was approaching.  (Duke Aff., p. 2).  The operator put out two BOLO calls regarding the truck, which included the description offered by the eyewitness. (Monosky Depo., pp. 51-55, 68-70, 218; Doc. # 32, Exhibit 12).  Moreover, when the officers arrived on the scene, the eyewitness specifically identified Plaintiff's truck as the truck that

was the subject of his 911 calls.[25] (Duke Aff., p. 2; Monosky Depo., pp. 216-218; Doc. # 32, Exhibit 20). The court finds that the 911 calls from a known caller, which included very specific descriptions of the truck driving erratically, combined with the caller's on-the-scene identification of Plaintiff's truck, are enough to give rise to the officers' reasonable suspicion that Plaintiff had violated the law.[26] *See United States v. Bell*, 457 F.2d 1231, 1238-39 (5th Cir. 1972)(finding that citizen eyewitness accounts are credible because eyewitnesses "are seldom involved with the miscreants or the crime. Eyewitnesses by definition are not passing along idle rumor, for they either have been the victims of the crime or have otherwise seen some portion of it"); *see also United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001)("An ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally sufficient to supply probable cause to stop the suspect.").

But the 911 calls were not the only basis for the officers' reasonable suspicion here – the officers were able to observe first-hand Plaintiff's ability to operate his vehicle safely when they instructed him to move his truck from the exit ramp to a nearby gas station. (Scarborough Depo., p.

_____

[25] The fact that the caller in this case was not anonymous lends additional credibility to the basis for reasonable suspicion. Under similar circumstances, the Sixth Circuit concluded that a known caller should be deemed as reliable as a known informant because a known caller can be subjected to criminal penalties for making a false report. *United States v. Long*, 464 F.3d 569, 573-74 (6th Cir. 2006). In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court suggested that information provided by a known person is nearly presumptively reliable in assessing whether the police have probable cause to obtain a search warrant. *Gates*, 462 U.S. at 233-34 ("[[I]f an unquestionably honest citizen comes forward with a report of criminal activity-which if fabricated would subject him to criminal liability-we have found rigorous scrutiny of the basis of his knowledge unnecessary.").

[26] Even considering Plaintiff's testimony that he was not driving erratically, (Plaintiff Aff.; Plaintiff Depo., pp 177-180), and the one 911 call that described the suspect vehicle as having a white - not maroon - cab (Silas Depo., pp. 119-120, 108, Ex. 4), the evidence is sufficient to give rise to reasonable suspicion.

32).  While attempting to move his truck, the officers observed Plaintiff sit through two traffic light

cycles and stall his truck at least three times before he was able to move it. (Monosky Depo., pp. 78-

79; Scarborough Depo., pp. 33-34).[27]  Then, after cranking his truck, Plaintiff drove over a curb on

his way to the gas station. (Monosky Depo., p. 78, 80).[28]  Those observations, combined with the

erratic driving reports from the 911 calls and Duke's identification of Plaintiff's truck, were far

beyond what is required under *Terry* as reasonable suspicion to investigate Plaintiff further.  Thus,

Defendants are due the protection of qualified immunity on Plaintiff's claim that he was unlawfully

seized for investigation prior to his arrest.[29]

---

[27] Plaintiff's explanation that his truck stalled because it was loaded with canned goods and parked on an incline (Plaintiff Depo., p. 29), does not negate that his actions could have given the appearance of impairment and/or given rise to a reasonable suspicion thereof.

[28] Officer Monosky testified as follows:

    After Bruce Scarborough finished talking to him and directing him to pull into the Chevron station, I observed him have trouble getting the truck into gear, pulling it off the roadway and into the Chevron station. What I mean by that is we sat through two cycles of traffic lights from green, yellow, red and again. His truck actually rolled back to where I got out of my car and was about to tell the witness to put it in reverse because I thought Mr. Angeline's truck was going to roll back into his. So, then, when he finally did get it in gear and initiated to pull over, he actually went up over a curb that's in between the ramp and the Chevron station.

(Monosky Depo. pp. 78-79).

[29] Because the court finds that no constitutional violation occurred with respect to the investigatory detainment of Plaintiff, it need not reach the secondary inquiry under a qualified immunity analysis of whether the law clearly established that detainment to be violative of the Constitution at the time it occurred.  The court notes the obvious point, however, that in light of its finding that the investigatory detainment was not in violation of Plaintiff's constitutional rights, it could not find that a reasonable officer in the position of the Defendant Officers in this case should have known that Plaintiff's clearly established rights were violated when he was detained.

Having found, pursuant to *Terry*, that the officers could lawfully detain Plaintiff for further investigation, the court must now turn to the question of probable cause for Plaintiff's arrest.  As one court observed, "there is no litmus paper test to determine when a proper investigatory detention pursuant to *Terry* has been transformed into an arrest requiring probable cause - the difference is one of degree and is dependent upon a fact specific inquiry that considers the 'totality of the circumstances.'"  *Marlowe v. Pinal County,* 2008 WL 4264724, at *5 (D.Ariz. 2008).

### 3.   Arrest Based Upon Driving Under the Influence

In this case, Plaintiff was arrested and charged with the misdemeanor violation of Alabama Code § 32-5A-191(a)(5), which provides:

> (a) A person shall not drive or be in actual physical control of any vehicle while:
> . . .
> (5) Under the influence of *any substance* which impairs the mental or physical faculties of such person to a degree which renders him or her incapable of safely driving.

Ala. Code § 32-5A-191(a)(5)(emphasis added).   The statute also cautions that "[t]he fact that any person charged with violating this section is or has been legally entitled to use alcohol or a controlled substance shall not constitute a defense against any charge of violating this section."  Ala. Code § 32-5A-191(d).

Under Alabama law, the offense of driving under the influence need not be committed in the officer's presence in order for an officer to have authority to arrest a person without a warrant for a violation thereof.  Alabama Rule of Criminal Procedure 4.1(a)(1)(iii) provides that "[a] law enforcement officer may arrest a person without a warrant if ... [a]ny offense has been committed in the law enforcement officer's presence or view, or ... [t]he arrest is otherwise authorized by statute, such as [the statute at issued in this case,] Ala. Code . . . § 32-5A-191."  Moreover, it is not

39

even essential for an officer to obtain eyewitness testimony that a suspect was seen driving in an erratic manner to establish that the suspect could not operate his vehicle safely. *See Rice v. State,* 611 So.2d 1161, 1163 (Ala.Cr.App. 1992).

Here, the undisputed facts indicate that the Defendant Officers had probable cause to arrest Plaintiff for a violation of Ala. Code § 32-5A-191(a)(5). First, the undisputed evidence regarding Plaintiff's demeanor and physical condition could have lead a prudent person to believe that Plaintiff was impaired. Plaintiff does not dispute that when he was asked by the officers to step out of his vehicle, he had trouble maintaining his balance as he walked and was very unsteady on his feet. (Monosky Depo., p. 76; Scarborough Depo., pp. 43, 50; Doc. # 32, Exhibit 20). As the officers were asking Plaintiff questions, he attempted to lean on his truck for support. (Monosky Depo., p. 76; Scarborough Depo., p. 44).

According to Plaintiff, who was seventy-three years old at the time of his arrest, his unsteadiness and lack of coordination were not due to impairment from medication, but instead caused by arthritis in his left knee. (Plaintiff Aff.; Plaintiff Depo., pp. 26-28). Although Plaintiff later told the officers he had arthritis just before the administration of the one-leg stand test (Plaintiff Aff., p. 3), there is no indication from the record that Plaintiff explained to the officers when he was stumbling out of his vehicle that his *marked* inability to maintain balance, his unsteady walk, and his need for assistance to stand were *all* the result of arthritis. Indeed, having reviewed the testimony indicating just how unsteady Plaintiff appeared on that morning,[30] the court finds that it was not

---

[30] Officer Monosky testified as follows:

When we asked him to step out of the truck, we walked around to the other side of his truck, he had trouble maintaining balance as he walked. He was very unsteady on his feet, appeared very uncoordinated. His demeanor just appeared to not be

unreasonable for the officers to assume that Plaintiff's initial unsteadiness was the result of impairment, not the result of a knee problem that was not even mentioned until later. *See Brooks v. City of Birmingham*, 584 So. 2d 451 (Ala. 1991), *overruled on other grounds, Franklin v. City of Huntsville*, 670 So.2d 848, 850-51 (Ala. 1995)(finding, on a claim for false arrest under § 1983, that diabetic was properly arrested for driving under the influence of alcohol despite the fact that his seeming incoherency and apparent intoxication was caused by low blood sugar, not intoxication). Because probable cause "does not deal with hard certainties, but with probabilities," law enforcement officers are entitled to formulate certain "common-sense conclusions about human behavior." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983).

Regardless of the real reason for Plaintiff's unsteadiness, there can be no doubt that his arthritis was not to blame for his slurred speech or "glossy" eyes. Both Scarborough and Monosky described Plaintiff's speech to be slurred and his eyes to be glossy and "glazed-over." (Scarborough Depo., pp. 41-42; Monosky Depo. pp. 76-78).  Both officers thought he seemed disoriented and observed that his speech was slurred.  (Scarborough Depo. p. 42; Monosky Depo. pp. 76-77). Although Plaintiff contends that the evidence is in dispute as to whether his speech in fact was slurred, he does so based upon what appears to be nothing more than a clerical error – an unknown

---

physically coordinated. As we stood there and asked him questions, he attempted to lean on his truck for support, which I tried to tell him not to. He also just appeared very disoriented, maybe confused and his eyes were what I would call glossy.
....
He had trouble maintaining his balance on his own. He had trouble walking straight. And he did have slurred speech.

(Monosky Depo.  pp. 76-77, 78).   At one point, Plaintiff acted "kind of like he was going to fall, a stagger, a stumble, like he was going to fall and [Officer Scarborough] reached and grabbed his arm and we balanced him." (Scarborough Depo. p. 55).

person at the police station at an unknown time checked the box for "normal" speech on the Arrest Report despite the fact that the Report's narrative section just below, which was completed by Monosky at the time of the arrest, states that Plaintiff "had slurred speech and had trouble maintaining his balance." (Arrest Report, p. 2; Monosky Depo. pp. 34-35, 76).  With the exception of this one "checked box," which is not supported by any testimony from someone who actually saw Plaintiff on the day of his arrest, the testimony is overwhelming that Plaintiff's speech was slurred on the day of his arrest.  (Monosky Depo. p. 76; Scarborough Depo. pp. 41-42; Doc. # 32, Exhibit 20).

Plaintiff's admission that he had ingested medication on the morning of the arrest also supports the officers' assessment that Plaintiff was impaired.  As for whether or not Plaintiff took Ambien, a controlled substance, on the day of his arrest, the court agrees with Plaintiff that the testimony is disputed as to whether he volunteered or admitted to the officers that he had taken that medication.  Thus, viewing the facts in the light most favorable to Plaintiff, the court has assumed that Plaintiff had not taken Ambien, or any other controlled substance, on that day.  Nevertheless, the Alabama statute under which Plaintiff was charged does not require that an individual be under the influence of a controlled substance or alcohol to be "under the influence" in violation of the law.  *See* Ala. Code § 32-5A-191(a)(5).  An individual need only have ingested *any* substance that renders him - whether knowingly or not - incapable of safely driving.  Thus, it is certainly relevant to the probable cause inquiry that, on the day of his arrest, Plaintiff admitted to the officers that he was under the influence of his blood pressure medication, a substance with known, potential side effects of light-headedness, tiredness, drowsiness, and dizziness – any of which might impair one's ability to drive. (Plaintiff's Depo., pp. 89-90).  Although Plaintiff contends that he had never knowingly

suffered those side effects from the medication, it is not outside of the realm of possibility that Plaintiff's medication did "impair [his] mental or physical faculties . . . to a degree which render[ed] him . . . incapable of safely driving." Ala. Code § 32-5A-191(a)(5).  And it certainly would not be unreasonable for the Defendant Officers to take that information into consideration when assessing Plaintiff's faculties and whether he had the ability to safely operate an eighteen-wheeler.

Finally, the officers' assessment of probable cause to arrest Plaintiff for being under the influence of a substance that impaired his ability to drive is also supported by Plaintiff's admitted inability to perform the HGN sobriety test correctly.[31]  Although both Plaintiff and Defendants devote much of their argument to the matter of whether this test was properly administered,[32] the

---

[31] In support of their probable cause argument, Defendants actually point to the results of *all three* of the sobriety tests that were undisputedly performed on the day of his arrest - the HGN test, the one-legged stand test, and the walk-and-turn test.  However, the court has only considered the results of the HGN test to be probative of probable cause because, viewing the evidence in the light most favorable to Plaintiff, his poor results on the other two tests could be a result of his arthritis, which was not accounted for in the administration thereof.  The evidence is undisputed that, in response to an inquiry by Monosky before those tests were performed, Plaintiff stated that arthritis in his legs might affect the results of the tests.  (Plaintiff's Aff., p. 3).  It is undisputed that Monosky made no concessions regarding Plaintiff's arthritis in having him perform the tests.  (Monosky Depo., pp. 235-236).  Although the court is aware that the record is devoid of any evidence from a doctor or medical expert establishing that Plaintiff's arthritis would likely prevent him from walking an imaginary line or raising his foot off the ground for six inches, as required by those tests, the court has nevertheless given Plaintiff the benefit of the doubt and will assume that his "failure" on those tests lends nothing to the analysis of probable cause.

[32] Plaintiff contends that the HGN test was not properly administered because Plaintiff was facing toward the interstate when the test was conducted and, based upon the HGN guidelines issued by NHTSA, a suspect should not be positioned to face toward the "blinking lights of a police cruiser or passing cars."  (Doc. # 40, Exhibit U, at 5).  There is simply no evidence that Plaintiff was looking at, or affected by, any blinking lights.  First, the test was administered during the daytime when the blinking lights of passing cars would likely not be an issue.  Moreover, although Plaintiff was

salient fact - which is undisputed - is that Plaintiff repeatedly failed to follow instructions regarding

his participation in the test.  Despite Monosky's repeated instructions that Plaintiff should follow her

finger with his eyes *only* while holding his head still, over and over again he followed her finger by

moving his head.  In fact, Plaintiff was only able to keep his head stationary when another officer

held his head still. (Monosky Depo., pp. 92, 95; Plaintiff Depo., p. 40-44).  The parties' arguments

seem to miss the boat.   It is not whether Plaintiff "passed" or "failed" the HGN test that assists the

court in analyzing probable cause;[33] it is his failure, after repeated instruction, to perform the test

correctly that lends support to the officers' assessment that Plaintiff was disoriented and impaired.

In a case involving facts closely akin to the ones at issue here, the Alabama Court of Criminal

Appeals upheld a defendant's conviction for being under the influence of any substance that

impaired his ability to safely drive in violation of Ala. Code § 32-5A-191(a)(5) even though the

conviction was supported only by the testimony of an officer that the defendant's eyes were "glossy,

glass-looking," that the defendant's speech was slurred, that the defendant had trouble determining

where he was, that the defendant had difficulty with repeated attempts to use the telephone, and that

the defendant stated that he had just received a shot for an injury to his arm. *Raper v. State*, 584

---

positioned "facing" toward the interstate when the test was conducted (Monosky Depo. p. 96), there
is no evidence that the interstate itself was even visible from his position at the gas station 50 to 75
yards from the exit ramp, much less that any passing cars on that interstate were in his line of sight.
The court finds no evidence to support Plaintiff's assertion that the test was improperly administered.
But more importantly, whether or not Plaintiff was facing toward "blinking lights" is not related to
his inability to hold his head still, which was the real reason he could not perform the test correctly.

[33] Although Alabama courts do allow the results of a HGN test to support an officer's
determination of probable cause, *Sides v. State*, 574 So.2d 856, 858 (Ala.Crim.App.1990), *aff'd* 574
So.2d 859 (Ala.1990); *Babers v. Tallassee*, 152 F.Supp. 2d 1298, 1306 (M.D. Al. 2001), it is
undisputed in this case that there was *no result to assess*.  Monosky testified that she "was not able
to" see any nystagmus in Plaintiff's eyes because of his repeated miscues.  (Monosky Depo., p. 97).

So.2d 544, 546-47 (Ala.Cr.App. 1991).  Under the facts of this case, the court finds that the eyewitness information from Duke, the officers' own observation that Plaintiff had difficulty moving his truck from the exit ramp to the gas station, the officers' detection of Plaintiff's "glossy" eyes and slurred speech and Plaintiff's marked unsteadiness and difficulty standing without assistance, Plaintiff's admission that he had consumed medication before driving that morning, and Plaintiff's difficulty with repeated attempts to correctly perform the HGN test, gave the Defendants at least arguable probable cause - if not actual probable cause - to arrest Plaintiff for driving under the influence.[34]  Thus, Defendants are due the protection of qualified immunity with respect to this claim.[35]

──────────────

[34] As the court observed earlier with respect to the "investigatory stop" claim, *see* discussion footnote 29 *supra*, in light of the finding that Plaintiff's arrest for driving under the influence was with probable cause and not in violation of his constitutional rights, the court need not - and cannot - find that a reasonable officer in the position of the officers here should have known that Plaintiff's clearly established rights were violated when he was arrested on this charge.

[35] Even if Plaintiff had not abandoned his excessive force claim, which he did (*see* discussion Section III, *supra*), the demise of his Fourth Amendment unlawful arrest claim would also be fatal to his excessive force claim, which is based solely on the lack of probable cause to arrest him, not on the use of any unlawful physical force.  (Plaintiff's Depo. pp. 138, 145, 164).  It is well-established that an officer's right to effectuate a lawful arrest, regardless of the severity of the offense, "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003)("This circuit has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense.").  "In the Eleventh Circuit, we recognize that the typical arrest involves some force and injury."  *Rodriguez v. Farrell,* 280 F.3d 1341, 1351 (11th Cir. 2002)(finding that "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal" in a case where the officer ignored the arrestee's screams of pain during the handcuffing process).  Thus, as occurred in this case, "the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

### C.    Search of Plaintiff's Vehicle After Arrest

Plaintiff next complains that the inventory of his automobile conducted by Officers Holder and Monosky[36] – which uncovered numerous Ambien pills contained in an aspirin bottle - was an unlawful search and seizure. To comport with the Fourth Amendment's proscription of unlawful searches and seizures, a search of a person's possessions "must normally be conducted pursuant to a warrant." *United States v. Prescott*, 599 F.2d 103, 105 (5th Cir. 1979); *California v. Acevedo*, 500 U.S. 565, 580 (1991) (reiterating that it is a "cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment'"). Nevertheless, courts have recognized certain "specifically established and well-delineated exceptions" to the general warrant rule, *Acevedo*, 500 U.S. at 580, including a longstanding exception for  "so-called 'inventory searches' of automobiles," *Prescott*, 599 F.2d at 105; *Sammons v. Taylor*, 967 F.2d 1533 (11th Cir. 1992). The Supreme Court has recognized the importance of inventory searches because when a car is impounded, "inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).  Inventory searches are excepted from the warrant requirement because they serve these "caretaking" purposes, and because they are not designed to uncover evidence of criminal activity. *South Dakota v. Opperman*, 428 U.S. 364, 370, n. 5 (1976)("In view of the noncriminal context of inventory searches ... courts have held – and quite correctly – that search warrants are not

---

[36] As noted earlier, the undisputed facts indicate that only Officers Holder and Monosky were causally connected to the inventory search of Plaintiff's truck.  *See* discussion in the introduction to Section IV, *supra*.

required.... With respect to noninvestigative police inventories of automobiles ... the policies underlying the warrant requirement ... are inapplicable.").

To ensure that an inventory search does not go beyond permissible bounds, it is important to ensure that each search is "designed to produce an inventory" and not used as "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells,* 495 U.S. 1, 4 (1990). Thus, "[a]n inventory search is reasonable under the Fourth Amendment only if it is done in accordance with *standard procedures* that limit the discretion of the police." *Wells,* 495 U.S. at 8 (Brennan, J., concurring)(emphasis added) (citing *Opperman*, 428 U.S. at 384 (Powell, J., concurring)). Thus, it is permissible for a police officer to be given the authority to exercise *some* discretion in conducting an inventory search, provided that his "discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine*, 479 U.S. at 375. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime," *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring).

Standard inventory procedures may be established by either "standardized criteria . . . or established routine." *Wells*, 495 U.S. at 4 (citing *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983)). Consistent with the Supreme Court's pronouncement in *Wells* that inventory procedures may be established by "established routine," *Wells*, 495 U.S. at 4, the majority of Circuits have held that such inventory policies need not be written and can be established by testimony regarding standard practices. *See, e.g., U.S. v. Hawkins,* 279 F.3d 83, 86 (1st Cir. 2002)("Such a standardized inventory policy may be unwritten.");*United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) ("The existence of such a valid procedure may be proven by reference to either written rules and regulations or

testimony regarding standard practices."); *United States v. Frank*, 864 F.2d 992, 1002-03 (3d Cir. 1988) (same); *United States v. Walker*, 931 F.2d 1066, 1068-69 (5th Cir. 1991) (finding no Fourth Amendment violation where "police department had an established but unwritten inventory policy," the purpose of which "was to protect the property of the owner and to reduce the potential liability of the police department"); *United States v. Lowe,* 9 F.3d 43,46 (8th Cir. 1993)(accepting testimony from law enforcement officers that department policy was to inventory vehicles of persons taken into custodial arrest, and opening bags within those vehicles was part of the inventory); *United States v. Feldman*, 788 F.2d 544, 551-53 (9th Cir. 1986) (affirming use of unwritten inventory policy).

In this case, after plaintiff was handcuffed and placed in Officer Monosky's patrol vehicle, Officer Holder performed the inventory search of Plaintiff's truck. (Holder Depo., pp. 25, 137). Holder used HPD's "Towed Vehicle Report," which is "a standard inventory form," *Opperman*, 428 U.S. at 366, to inventory valuables observed in the cab of the truck (Holder Depo., pp. 27-29; Doc. # 32, Exhibit 19).   During the inventory, Officer Holder also saw - at eye level in an open compartment - a daily medication dispenser and a little Bayer aspirin bottle.  (Holder Depo., pp. 31-32; Holder Aff., p. 2; Doc. # 32, Exhibit 13, p. 1). Holder informed Monosky of his findings, who then retrieved the medications, opened the bottle of aspirin, and found therein 13 pills of what was later identified as the sleeping aid Ambien. (Holder Depo., pp. 33, 63; Monosky Depo., pp. 46-49). The Alabama Department of Forensics confirmed that the 13 tablets were Ambien, a Class-IV controlled substance. This discovery led to the plaintiff being charged with a felony unlawful possession of a controlled substance.  (Doc. # 40, Exhibit H).

The inventory of Plaintiff's vehicle - and subsequent retrieval of medications found therein - was conducted pursuant to a written HPD policy, which provides that when a suspect has been

arrested and his vehicle is to be impounded, the vehicle must be inventoried prior to impoundment.[37] (Monosky Depo., p. 181; Holder Depo., pp. 50-53; Monosky Aff., p. 2; Scarborough Aff., pp. 2-3; Holder Aff., pp. 1-2; Doc. # 32, Exhibit 23, p. 2). The purpose of such an inventory is to secure any valuables inside of the vehicle in order to protect the owner from loss of property and to protect the police officers against allegations of misconduct, because sometimes valuables are removed from the vehicle. (Monosky Depo., pp. 44-45; Holder Depo., p. 34; Holder Aff., p. 2; Doc. # 32, Exhibit 23, p. 2). Thus, during an inventory, officers look for valuable items the arrestee is not going to take with them. (Scarborough Depo., p. 63).

Testimony from Officer Holder also explains that it is routine and customary for the officer to identify and transport with the arrestee all medications discovered during the inventory in the event that the arrestee needs the medication during his detainment.  (Holder Aff., p. 3).  Likewise, it is routine for the officer to inspect the contents of containers with pills and to remove any loose

---

[37] The City's policy governing inventory searches, which is contained in its Standard Operating Procedures, provides:

> It is the standard procedure of the Hoover Police Department to inventory all vehicles towed on the order of an officer of this Department. This procedure has been implemented to protect the property of vehicle operators against loss and to protect the police officers of the City of Hoover, Alabama, against claims of misconduct in the protection of that property.  Each vehicle shall be inventoried by an officer at the scene prior to its removal.  However, in case where  the vehicle is protected pending the obtaining of a search warrant (as in felony arrests, criminal investigation, or other extenuating circumstances) said vehicle may be searched at a later time by Technical Services Crime Scene Investigators.  After the inventory is completed, the vehicle and its contents shall be secured and the key turned over to the wrecker driver.

> NOTE: In any case where a search warrant may be sought, an investigator or Crime Scene Investigator shall be consulted before beginning an inventory.

(Doc. # 40, Exhibit L, p. 2, Section F).

pills found during inventory in order to identify them.  (Holder Depo., p. 63; Scarborough Depo., p. 99).  According to HPD policy, Poison Control must be contacted to identify all unknown pills. (Scarborough Depo., p. 99; Monosky Aff., p. 3; Holder Aff., p. 3).

Plaintiff contends that the City's policy regarding inventory searches is unconstitutional - both facially and as applied to Plaintiff - because "it provides *absolutely no guidance whatsoever* to the officers in when they are allowed to open a sealed container during an inventory search."  (Doc. # 35, at 12)(emphasis in original).  Plaintiff's argument misses the mark.  First, Plaintiff's argument misconstrues what is required under the law of this Circuit.  While Plaintiff is correct that the opening of containers found during inventory searches must be regulated in some form or fashion, the Supreme Court has reiterated that the policy need not mandate that the opening of containers "be conducted in a totally mechanical 'all or nothing' fashion."  *Wells*, 495 U.S. at 4 (finding that in the absence of *any* "policy whatever with respect to the opening of closed containers encountered during an inventory search . . . . [, an inventory] search [i]s not sufficiently regulated to satisfy the Fourth Amendment").  In other words, "[a] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself."  *Wells*, 495 U.S. at 4; *see also United States v. Andrews*, 22 F.3d 1328, 1336 (5th Cir. 1994) (finding that none of the relevant Supreme Court decisions require "a law enforcement agency's inventory policy to address specifically the steps that an officer should take upon encountering a closed container").

But what is most misguided about Plaintiff's argument is that, in this case, the relevant procedure which authorized the opening of the aspirin bottle found to contain Ambien was not a blanket statement dictating the circumstances in which *any type* of closed container found during an

50

inventory can be opened.  Instead, the Defendant Officers were authorized to open the aspirin bottle based upon a very specific requirement that, pursuant to established routine, all medications located during an inventory are to be retrieved and identified.  Testimony from all three officers present on the scene sets forth HPD's established routine of locating, identifying, and retrieving any medications located in the vehicle. *See, e.g.*, *Illinois v. LaFayette*, 462 U.S. 640, 641-42 (1983) (finding that discovery of ten amphetamine pills inside of arrestee's cigarette case was not unlawful search and seizure because it was not unreasonable for police, as part of routine procedure, to inventory such a container in the arrestee's possession).

It is of no moment that, at the time Officer Monosky opened the aspirin bottle, she already believed that "inspecting the contents . . . could lead to the discovery of contraband." (Monosky Aff. pp. 2-3).  Even if the police officer suspects contraband or evidence to be inside the vehicle, the inventory may nevertheless be deemed reasonable.  *See U.S. v. Grossman*, 233 Fed.Appx. 963, 968 (11th Cir. 2007).

Moreover, there is no evidence, as Plaintiff suggests, that the inventory was targeted to find contraband while ignoring potentially exculpatory evidence.  Although it is undisputed that plaintiff had a valid medical prescription for the Ambien at the time of his arrest, and is therefore, factually innocent of the felony charge (Doc. # 40, Exhibit V), none of the officers were aware of that prescription at the time of the search.  Despite Plaintiff's insistence that a prescription bottle for Ambien was on the same shelf as the aspirin bottle and daily dispenser (Plaintiff Depo., pp. 83-84,121), he admits that the police officers would not have seen his prescription bottle for Ambien because it had "fallen behind" some things (a fact which he discovered after emptying the compartment upon his release from jail).  (Plaintiff Depo., p. 121). Officer Holder testified that he

51

does not recall seeing a prescription bottle for Ambien on the shelf,[38] nor was it among other pill bottles retrieved from the cab of Plaintiff's truck. (Holder Depo., pp. 32, 60; Monosky Aff., p. 3; Holder Aff., p. 3). According to the Defendants, they were unable to ask Plaintiff about the medications they discovered during the inventory at the scene of his arrest because he appeared to be passed out in the back of Officer Monosky's truck. (Monosky Depo., p. 147).[39] There is simply no evidence that the Defendants' inventory search was targeted at contraband while ignoring exculpatory evidence.

As a final note, the court is befuddled by Plaintiff's complaint that his briefcase, another closed container which was also in the cab of the truck, remained unopened. (Doc. # 35, at 13) (citing Holder Depo., p. 60). The fact that Defendants only opened containers that may have contained medication needed by Plaintiff during his detainment offers more proof - not less - that the "inventory search [was] not a surrogate for investigation, and [that] the scope of an inventory search [did] not exceed that necessary to accomplish the ends of the inventory." *United States v. Khoury*, 901 F.2d 948, 958-59 (11th Cir. 1990). Indeed, the decision not to open the briefcase indicates that the officers were not on a fishing expedition for contraband, but instead were operating within the confines of the City's stated purpose and established routines for conducting inventories.

_____

[38] Plaintiff's contention that Defendant Holder's deposition testimony is internally inconsistent with regard to whether or not he saw any prescription bottles in the truck is unfounded. Holder's first statement that he did not remember seeing any prescription bottles on the shelf (Holder Depo. p. 32), is not inconsistent with his later testimony that there were no prescription bottles on the shelf (Holder Depo. p. 60).

[39] Although Plaintiff testified that he informed several officers at the jail that he had a prescription for the Ambien in his truck (Plaintiff Depo., pp. 117-19), it was too late for the officers to retrieve it because his car already had been impounded.

The undisputed facts indicate that the officers' search of Plaintiff's car for the purpose of creating an inventory was lawful under the Fourth Amendment's inventory exception.

In any event and alternatively, the court finds that the search of the cab of Plaintiff's truck was lawful not only under the inventory exception but also under the "search incident to lawful arrest" exception, which is designed to ensure the protection of law enforcement officers as they conduct an arrest.   *See Chimel v. California*, 395 U.S. 752, 763 (1969).   It is undisputed that Plaintiff was under arrest before his truck was searched by Officer Holder (Monosky Depo., p. 112), and the court has already found that the officers had probable cause to effectuate that arrest of Plaintiff for driving under the influence.  As the Eleventh Circuit has noted:

> When an occupant of an automobile is the subject of a lawful arrest, the Fourth Amendment permits the arresting officers to contemporaneously conduct a warrantless search not only of the occupant himself . . . , but also of the passenger compartment of the automobile, as well as any closed (or open) containers found in this area of the automobile. *New York v. Belton*, 453 U.S. 454, 460 (1981); *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1222 (11th Cir. 1993).  "Containers," in this context, refer to "any object capable of holding another object," *New York v. Belton*, 453 U.S. at 460 n. 4, 101 S.Ct. at 2864 n. 4, and thus include an automobile's glove compartment (whether locked or unlocked), as well as any containers found therein, such as [a] zipped leather bag. . . .

*U.S. v. Gonzalez,* 71 F.3d 819, 825-26 (11th Cir. 1996).  In this case, Holder limited his search to the passenger compartment of Plaintiff's truck. (Holder Depo., p. 61).  The containers found and opened during the search included an aspirin bottle and daily medication dispenser, both of which were located in plain site on a shelf of the living compartment of the cab of the truck. (Holder Depo., pp. 31-32; Holder Aff., p. 2).  The court finds that because the Defendant Officers' search was incident to a lawful arrest and comports with the requirements therefore, the search of Plaintiff's vehicle complies with the Fourth Amendment for this alternative reason.

Accordingly, the court finds that based upon the above-referenced precedent, which was clearly established at the time of the allegedly offensive search, the Defendant Officers lawfully conducted an inventory of Angeline's truck and lawfully inspected the contents of the containers retrieved during the inventory.   They are due, therefore, the protection of qualified immunity, and summary judgment will be granted on this claim against them.

**D.      Arrest of Plaintiff for Felony Possession of a Controlled Substance**

Plaintiff's next claim concerns his felony arrest, based upon the discovery of Ambien during the inventory search, for possession of a controlled substance.   Alabama Code § 13A-12-212 provides, in pertinent part:

> (a)      A person commits the crime of unlawful possession of controlled substance if:
>
>> (1)      Except as otherwise authorized, he possesses a controlled substance enumerated in Schedules I through V.
>>
>> (2)      He obtains by fraud, deceit, misrepresentation or subterfuge or by the alteration of a prescription or written order or by the concealment of a material fact or by the use of a false name or giving a false address, a controlled substance enumerated in Schedules I through V.
>
> (b)      Unlawful possession of a controlled substance is a Class C felony.

Ala. Code § 13A-12-212.

In this case, it is undisputed that Plaintiff was in possession of a controlled substance that was not in a prescription bottle.  The pill bottles seized by Officers Holder and Monosky from Plaintiff's truck did not bear a prescription label for Ambien. (Monosky Aff. p. 3; Doc. # 32, Exhibit 11, p. 1). After Plaintiff was escorted to the police department, Officer Monosky called Poison Control and described the medication, and Poison Control identified 13 of the pills as Ambien, a Class-IV

controlled substance. (Monosky Depo., pp. 151-52; Monosky Aff., p. 3; Doc. # 32, Exhibit 14; Ala. Code §§ 20-2-28, 20-2-29).[40]   After verifying that Plaintiff had a controlled substance in his possession, Officer Monosky notified the detective in charge, as required by HPD procedure (Monosky Depo., pp. 152-53), who then instructed her to charge Plaintiff with felony unlawful possession of a controlled substance. (Monosky Depo., pp. 153-57; Doc. # 32, Exhibits 11, 17).

It is also undisputed, however, that Plaintiff was - at all times - factually innocent of the charge of unlawful possession of a controlled substance (Doc. # 40, Exhibit V), because he had a valid prescription for Ambien – a fact that he repeatedly, and vehemently, told Defendants after his arrival at the jail.  Plaintiff testified that during his approximately twenty-eight hours of detainment at the City jail, he informed numerous officers that he had a prescription for Ambien, averred that the prescription label was in his truck, and offered and requested to phone his doctor or pharmacy to confirm that prescription. (Plaintiff Depo., pp. 117-20).  Plaintiff specifically informed Monosky that he had such a prescription while she was on the telephone with the detective who later instructed her to charge Plaintiff with the felony offense.  (Plaintiff Depo. p. 179).[41]

---

[40] Later, the Alabama Department of Forensics also confirmed that the 13 tablets were indeed Ambien. (Doc. # 32, Exhibit 14).

[41] Monosky disputes this fact, but she has stated that she is not even sure she would have allowed him to make such a call if she had heard him offer.  (Monosky Depo. pp.179-80).

1.      **The Arrest of Plaintiff by the Defendant Officers[42] for Felony Possession Violated the Fourth Amendment**

As noted earlier, the Eleventh Circuit has made clear that officers investigating the existence of probable cause "should not be permitted to turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they ch[o]ose to focus upon." *Kingsland*, 382 F.3d at 1228.   In *Kingsland*, a case that involved a Fourth Amendment false arrest allegation (among other claims), the Eleventh Circuit reversed the district court's grant of qualified immunity, which the district court had bestowed upon the defendant police officers who had arrested Kingsland for driving under the influence of cannabis after she collided with an unmarked police car. *Kingsland*, 382 F.3d at 1228-34.   In its Fourth Amendment analysis of the defendant officers' probable cause for arrest, the Eleventh Circuit "consider[ed] whether the defendants' investigation was constitutionally deficient," *Kingsland*, 382 F.3d at 1228, and criticized the district court for "focus[ing] on the reasonableness of Kingsland's arrest given what the officers *did investigate*, [while] ignoring the fact that they may have subjectively failed to investigate both sides of the story," 382 F.3d at 1229 (emphasis added).   The court observed that the defendant officers "ignore[d] information that ha[d] been offered to [them], such as Kingsland's assertions that she was injured and that [the unmarked police car with which she collided] ran the red light," and "elect[ed] not to obtain easily discoverable facts, such as whether there was cannabis in the truck or whether witnesses were available to attest to who was at fault in the accident." *Kingsland*, 382 F.3d at 1229.

---

[42] As noted earlier, the undisputed facts indicate that only Officers Holder and Monosky were causally connected to the discovery of the controlled substance and Plaintiff's eventual arrest for possession thereof.  *See* discussion in the introduction to Section IV, *supra*.

After reviewing the record in that case, the court in *Kingsland* held that it could not find, as a matter of law, that probable cause existed for the arrest because genuine issues of material fact existed regarding whether the defendants had failed to conduct a reasonable investigation and ignored certain facts within their knowledge in an effort to manufacture probable cause. *Kingsland*, 382 F.3d at 1231. And when the facts were "[v]iewed in the light most favorable to Kingsland, the evidence show[ed] that the arresting officers . . . behaved in an objectively unreasonable fashion and were therefore not entitled to qualified immunity." *Kingsland*, 382 F.3d at 1234. In so finding, the court adopted the Fourth Circuit's analysis and established that the "'[qualified immunity analysis] must charge [the officer] with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances,'" and prohibits officers from "ma[king] an arrest without heeding certain, easily obtained information." *Kingsland*, 382 F.3d at 1228 (citing *Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988)).

In light of *Kingsland*, Defendants' argument that "there was no exculpatory evidence 'readily available' to the Defendant Officers with respect to [Plaintiff's] arrest for unlawful possession of a controlled substance" (Doc. # 42, at 16), misses the mark. Although Defendants are correct that the undisputed evidence suggests they were not told, *at the scene of Plaintiff's initial arrest for driving under the influence*, that the truck contained a prescription bottle that might exonerate Plaintiff of the felony charge, that fact is of little consequence because Plaintiff was not arrested for the felony charge *until after he had arrived at the police station*. (*See* Monosky Depo. pp. 151-57) (revealing that Officer Monosky did not arrest Plaintiff for possession of a controlled substance until she was told to do so after conferring with the detective after they arrived at the station). Viewing the facts in the light most favorable to Plaintiff, by the time that Defendants determined to charge Plaintiff

with the felony offense, Plaintiff had certainly informed the officers about the existence of a prescription for Ambien and had even given the officers the name of his doctor for verification. (Plaintiff Depo. pp. 118-20).  Although it may have been impractical at that point for the officers to retrieve the actual prescription bottle from the truck, which already had been impounded (Plaintiff Depo. pp. 118-20 ), it was certainly not impractical for the officers to use the telephone to verify that prescription.  Despite the ease with which that information could have been verified, the Defendants – just as their counterparts in *Kingsland* – "ignore[d] information that ha[d] been offered to [them], such as [plaintiff's] assertions" and "elect[ed] not to obtain easily discoverable facts, such as whether [he had a valid prescription for Ambien]." *Kingsland*, 382 F.3d at 1229.[43]

The case of *Burdeshaw v. Snell*, 350 F.Supp.2d 944 (M.D.Ala. 2004), which also concerned a plaintiff's protestations regarding exculpatory evidence in the form of a prescription for a controlled substance, is informative, although not binding.  In *Burdeshaw*, Officer Snell arrested Burdeshaw for possession of prednisone when he discovered the pills on his person after searching him. *Burdeshaw*, 350 F.Supp.2d at 949-50.  Although Burdeshaw advised Officer Snell "that there were medicine or pill bottles in his truck for all of the medicines in the pill bottle on his person[,]

---

[43] This is not a case where the officers simply disregarded Plaintiff's *story* or his hollow protestations of innocence.  Rather, the officers ignored Plaintiff's specific direction regarding how - with one simple telephone call - they could discover conclusive, exculpatory evidence of a *felony* charge.  *Cf. Williams v. City of Homestead, Fla.*, 206 Fed. Appx  886, 888-89 (11th Cir. 2006) (finding that while a reasonable investigator "should consider a suspect's explanation in evaluating the existence of probable cause, he is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest if the facts as initially discovered provide probable cause"); *Marx*, 905 F.2d at 1507 n. 6 (finding that defendant officers "were under no obligation to give credence to [plaintiff's] theory" and "were not required to forego arresting [plaintiff] based on initially discovered facts showing probable cause simply because [plaintiff] offered a different explanation").  Nor were there any exigent circumstances in this case that would prevented the officers from making that simple telephone call before charging Plaintiff.

. . . Snell refused to look in the truck." *Burdeshaw,* 350 F.Supp.2d at 949-50.  The court held that Officer Snell may have negated a "reasonable belief" that probable cause existed "[b]y failing to acknowledge or investigate Burdeshaw's explanation."  *Burdeshaw,* 350 F.Supp.2d at 950.  The court emphasized that, in that case, Snell "could easily have checked Burdeshaw's truck for the prescription bottle" because it was readily "'available' to Snell." *Burdeshaw,* 350 F.Supp.2d at 950. In so noting, the court found that Snell's obligation to investigate "Burdeshaw's contention regarding the location of the prescription bottles is comparable to checking the glove compartment of a vehicle for a drivers license when the driver doesn't have it on his person, or checking the trunk of a vehicle for proof of insurance when it cannot be found inside the vehicle."  *Burdeshaw,* 350 F.Supp.2d at 950.  Although the officers in this case may not have disregarded an opportunity to find the actual prescription bottle as the officers did in *Burdeshaw*, information regarding the existence of the prescription itself was certainly readily available.

"Qualified immunity is, as the term implies, qualified. It is not absolute. It contemplates instances in which a public official's actions are not protected." *Kingsland*, 382 F.3d at 1233.   In this case, "there are several questions of fact regarding the information the defendants . . . could have possessed had they chosen to investigate as a reasonable officer would have done. Without further factfinding, it is impracticable to conclude that arguable probable cause existed for [Plaintiff's arrest and continued detention for possession of a controlled substance] when it is unclear . . . what further knowledge, if any, would be attributed to the defendants if they had investigated reasonably." *Kingsland*, 382 F.3d at 1232.  Indeed, there is no evidence that any of the officers made a "good faith effort to discover information that would have helped clarify the situation [they were] presented with. On the contrary, a reasonable jury could find that the [officers'] investigation was deficient in that

59

the officers consciously and deliberately did not make an effort to uncover reasonably discoverable, material information." *Kingsland*, 382 F.3d at 1230.  Accordingly, genuine issues of material fact prevent the court from finding as a matter of law that arguable probable cause exists for this particular felony arrest and, when the facts are "[v]iewed in the light most favorable to [Plaintiff], the evidence shows that the arresting officers . . . behaved in an objectively unreasonable fashion and [are] therefore not entitled to qualified immunity." *Kingsland*, 382 F.3d at 1234.[44]  Thus, the question of whether arguable probable cause existed for Plaintiff's arrest and detainment for possession of a controlled substance is aptly suited for a jury, and therefore, at this procedural juncture, this claim survives the qualified immunity hurdle.[45]

## 2.    The Law Was Clearly Established at the Time of Plaintiff's Arrest

From a temporal standpoint, the August 31, 2004 *Kingsland* decision of the Eleventh Circuit was certainly in effect at the time of Plaintiff's November 3, 2005 arrest.  Moreover, although the

---

[44] In other words, Defendants ignored reasonably discoverable, material information "which, if true, makes the information on which they based their arrest less than 'reasonably trustworthy' under the circumstances." *Kingsland*, 382 F.3d at 1231.

[45] Defendants' citation to *Thermidor v. Miami-Dade County,* 248 Fed. Appx. 61 (11th Cir. 2007), is also inapposite.  Defendants rely upon *Thermidor*'s pronouncement that "the discovery of 'new, conflicting information' does not 'conclusively vitiate [the defendants'] probable cause.'" (Doc. # 42, at 12-13 (citing *Thermidor*, 248 Fed. Appx. at 63-64)).  Aside from the fact that *Thermidor* is unpublished and not binding (*see* 11th Cir. Rule 36-2), the facts are distinguishable from this case. *Thermidor* involved probable cause to detain a potentially wanted suspect after a warrant had been issued for his arrest.  *Thermidor*, 248 Fed. Appx. at 63-64. The Eleventh Circuit found that no Fourth Amendment violation had occurred when the arresting officer did not release the suspect in the jailhouse parking lot after receiving, at best, potentially conflicting information regarding the validity of the felony warrant that failed to *conclusively* invalidate probable cause. *Thermidor*, 248 Fed. Appx. at 63-64.  This case – unlike *Thermidor* – did not involve a warrant for arrest.  Moreover, in this case, had the officers made one phone call to the pharmacy or doctor to verify Plaintiff's statements, the information received would have *conclusively* vitiated probable cause to arrest Plaintiff for possession of a controlled substance.

court recognizes that the Eleventh Circuit was careful to note that *Kingsland* was "a unique and exceptional case wherein the investigating officers were responding to a call made by a fellow officer ... to an accident involving that very officer," *Kingsland*, 382 F.3d at 1228 n. 9, that is not enough to remove the officers' conduct in this case from *Kingsland*'s purview.  As the Supreme Court clarified in *Hope*, the fact pattern of prior cases used to show that a right is clearly established need not be "fundamentally similar" or even "materially similar" to the facts alleged. *Hope*, 536 U.S. 730, 740-41 (2002). Rather, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. 730, 740-41 (2002).  Thus, the nub of the inquiry is whether "the state of the law [at the time of the alleged violation]" gave the officials "fair warning that their [acts were] unconstitutional." *Hope*, 536 U.S. 730, 740-41 (2002).

   *Kingsland* did just that for the officers in this case.  Although Plaintiff has not alleged in this case (as the plaintiff did in *Kingsland*) that the Defendant Officers were "covering up a fellow officer's wrongdoing," *Kingsland*, 382 F.3d at 1228 n. 9, *Kingsland* does not require a finding that the officers's investigation was unreasonable or biased *because the officers were trying to protect another officer*.  The evidence in this case, when viewed in the light most favorable to Plaintiff, suggests, as the evidence did in *Kingsland*, that "[D]efendants chose to either ignore or misrepresent [] facts, which, if true, makes the information on which they based their arrest less than "reasonably trustworthy" under the circumstances."  *Kingsland*, 382 F.3d at 1231 and n. 11 (citing *Rankin*, 133 F.3d at 1435 ("We recall that probable cause requires that 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is

committing, or is about to commit an offense.'")).  For these reasons, the court concludes that summary judgment is inappropriate on the merits of this claim.

### E.    Continued Detention of Plaintiff

Plaintiff next alleges that Defendants[46] continued to detain him at the City jail long after any alleged probable cause for driving under the influence had evaporated, giving rise to a separate Fourth Amendment violation and claim.[47]  Although it is not entirely clear in this Circuit "[t]he precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment)," *Hicks v. Moore*, 422 F.3d 1246, 1253 n. 7 (11th Cir. 2005), "it is clear that the Fourth Amendment's prohibition of unreasonable seizures extends for some time beyond the moment of arrest and, for [Plaintiff's] purposes, encompasses the [time] he was detained after his arrest and prior to posting bail," *Strickland v. City of Dothan, AL*, 399 F.Supp.2d 1275, 1285 (M.D. Ala.2005), *aff'd without opinion*, *Strickland v. Summers*, 210 Fed.Appx. 983 (11th Cir. 2006).  *See also United States v. Myers*, 972 F.2d 1566, 1571-72 (11th Cir. 1992) (upholding a Fourth Amendment jury instruction in a post-arrest, pre-charge excessive-force case).[48]  It should be of no surprise, therefore, that the

---

[46]   As noted earlier, the undisputed facts indicate that only Officers Scarborough and Monosky were causally connected to the continued detention of Plaintiff for driving under the influence.  *See* discussion in the introduction to Section IV, *supra*.

[47] Because the court has already determined that the Defendants lacked probable cause to arrest Plaintiff for the felony offense of possession of a controlled substance, *see* discussion Section IV.D, *supra*, it logically follows that the continued detention is also unlawful.  Thus, the court's analysis here concerns only Plaintiff's allegation that the Defendants unlawfully detained him on the misdemeanor driving under the influence charge.

[48] Other Circuits have also extended the Fourth Amendment's protection beyond the initial arrest to encompass the continued custodial detention of a suspect.  *See Lauro v. Charles*, 219 F.3d 202 (2nd Cir. 2000) (finding a Fourth Amendment violation where plaintiff was arrested, processed

Fourth Amendment's post-arrest protection gives rise to "two discrete [claims based upon a plaintiff's] arrest and his subsequent detention – both of which involve a 'seizure' and should be analyzed under the 'objective reasonableness' standard of the Fourth Amendment." *Strickland*, 399 F.Supp.2d at 1285.[49]

---

and subsequently taken from the police station and displayed to the press in a staged "perp walk."); *United States v. Johnstone*, 107 F.3d 200, 206-207 (3rd Cir. 1997) (finding that the Fourth Amendment was properly applied where arrestee was beaten in the garage of police station); *Brothers v. Klevenhagen*, 28 F.3d 452, 456 (5th Cir. 1994)(listing a number of factors to be considered in determining whether an arrest has evolved into a pre-trial detention, including (1) whether the incident of arrest is complete; (2) whether the arrestee is released from arresting officer's custody, and (3) whether the arrestee is in detention awaiting trial for a significant period of time); *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988) (holding that a seizure "continues throughout the time the person remains in the custody of arresting officers");  *Reed v. City of Chicago*, 77 F.3d 1049, 1052 (7th Cir. 1989) (defining an arrest as that period of time between the initial seizure and presentation to a magistrate for a determination of probable cause); *Wilson v. Spain*, 209 F.3d 713 (8th Cir. 2000) (applying the Fourth Amendment where a suspect was injured after having been booked and placed in a cell); *Fontana v. Haskin*, 262 F.3d 871, 879 (9th Cir. 2001) ("[O]nce seizure occurs it continues throughout the time the arrestee is in the custody of the arresting officers."); *Barrie v. Grand County*, 119 F.3d 862, 866 (10th Cir. 1997) (finding that the Fourth Amendment applies to "a period of detention immediately following arrest and before the person is taken before a magistrate official, to determine whether the arrest and detention are based on probable cause").

[49] The court distinguishes this claim for post-arrest, continued custodial detention from a "continuing seizure claim" based upon pretrial release conditions, which was criticized by the Eleventh Circuit in *Kingsland* upon review of Justice Ginsburg's concurring opinion in *Albright v. Oliver*, 510 U.S. 266 (1994) (plurality opinion) (Ginsburg, J., concurring).  In that concurring opinion, Justice Ginsburg explained her view that even a *released* criminal defendant facing pretrial remains "continually seized" for Fourth Amendment purposes:

> A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense. A defendant incarcerated until trial no doubt suffers greater burdens.

The existence of two discrete claims based upon arrest and continued detention means that conceivably, an officer can comport with the Fourth Amendment by possessing probable cause for arresting a suspect, but then later violate the Fourth Amendment by unlawfully detaining the same suspect on the same charge without probable cause (or when probable cause no longer exists). Thus, the salient question is: at what point does the continued detention of a suspect, lawfully arrested without a warrant but with probable cause, become an unlawful seizure? District courts in this Circuit (and the Eleventh Circuit in an unpublished opinion) have held that when new information comes to light that erodes the basis for the initial probable cause to arrest,[50] a police officer has an affirmative duty to release the arrestee:

> [F]ollowing a lawful warrantless arrest, a police officer has an affirmative duty to release an arrestee if he ascertains beyond a reasonable doubt that the probable cause

> That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.

*Albright*, 510 U.S. at 278-79 (Ginsburg, J., concurring). After reviewing Justice Ginsburg's concurring opinion, the Eleventh Circuit observed that "[n]otwithstanding the eminence of its sponsor, our circuit has previously noted that we have doubts about the viability of this theory." *Kingsland*, 382 F.3d at 1235-36 (citing *Whiting v. Traylor*, 85 F.3d 581, 584 (11th Cir. 1996)(stating "[w]e also have questions about the ['continuing seizure'] theory ...." and acknowledging the Seventh Circuit's post-*Albright* rejection of the "continuing seizure" theory in *Reed v. City of Chicago*, 77 F.3d 1049, 1052 n. 3 (7th Cir. 1996)).). In any event, this controversial claim is not what is at issue in this case.

[50] Although an unlawful seizure may result, at that point, from the continued detention of a suspect, it will not retroactively invalidate the probable cause that existed for the *initial* arrest. *Pierson v. Ray*, 386 U.S. 547, 555 (1967) (stating that "[u]nder the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved").

which formed the basis of the arrest was unfounded.  *Babers v. City of Tallassee, Alabama*, 152 F. Supp. 2d 1298, 1309 (M.D. Ala. 2001).  This standard, adopted by the district court in *Babers*, was articulated in *Thompson v. Olson*, 798 F.2d 552 (1st Cir. 1986) (announcing the standard in the context of a state-law claim of false imprisonment), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987), and followed by the Fifth Circuit in *McConney v. City of Houston*, 863 F.2d 1180 (5th Cir. 1989) (applying the standard to constitutional claims arising out of a warrantless arrest) and *Duckett v. Cedar Park*, 950 F.2d 272, 278 (5th Cir. 1992) (granting qualified immunity to officers and holding that "a plaintiff may state a constitutional claim if, after police officers make an arrest pursuant to a warrant, the police officers fail to release the arrestee after they receive information upon which to conclude beyond a reasonable doubt that such warrant had been withdrawn.").

*Strickland*, 399 F.Supp.2d at 1291.   Thus, "'a police officer, upon an initial finding of probable cause, may [not] close his eyes to all subsequent developments.... Probable cause to arrest does not suspend an officer's continuing obligation to act 'reasonably.'" *Babers*, 152 F.Supp.2d at 1308 (quoting *Thompson*, 798 F.2d at 556 and citing *Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975)). However, on the other hand, an officer "'having once determined that there is probable cause to arrest ... should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car.'" *Babers*, 152 F.Supp.2d at 1308.

Accordingly, the question is one of degree – does the newly obtained information so detract from the initial probable cause determination to be clear beyond a reasonable doubt?  Plaintiff's allegation that he was unlawfully detained is two-fold: (1) the police should have released him after the results of his breathalyzer test revealed no alcohol in his system; and (2) the police unlawfully prevented him from procuring an independent test to prove he was innocent of the charges.  (Doc. # 35, at 18-21). The court will measure each Fourth Amendment claim of continued detention against the standard referenced above.

65

### 1.      Detainment After Receiving Breathalyzer Test Results

The court finds no constitutional violation as to the first part of Plaintiff's claim – that he was unlawfully detained after administration of the breathalyzer test.  While it is undisputed that at approximately 11:55 AM on the morning of his arrest, Plaintiff willingly submitted to a breathalyzer test which conclusively proved that he had no *alcohol* in his system (Doc. # 40, Exhibit M), that test did not rule out Plaintiff's impairment by another *substance* "which impair[ed his] faculties . . . to a degree which renders him [] incapable of safely driving." Ala. Code § 32-5A-191(a)(5).  Section 32-5A-191(a)(5) does not require that a person consume *alcohol* to sustain the charge. *See Raper*, 584 So.2d at 546-47 (finding that, even though breathalyzer test detected no alcohol in Raper's system, evidence nevertheless was sufficient to sustain a conviction for being under influence of another substance in violation of § 32-5A-191(a)(5)); *see also Fiorillo v. Cannon,* 1998 WL 35177564, at *2  (M.D.Fla. 1998)(finding that breathalyzer result of 0.00 did not give rise to an affirmative duty to release the arrestee because the "the 0.00 result was only new evidence [while] . . . . [t]he possibility that Plaintiff was under the influence of a drug - illegal or otherwise - still remained").  In fact, courts in Alabama have held that Subsection (a)(5) was enacted to cover those situations in which the defendant's mental and/or physical faculties are impaired by some substance other than alcohol. *Sturgeon v. City of Vestavia Hills*, 599 So.2d 92, 93-94 (Ala.Crim.App.1992).[51]

---

[51] Although Plaintiff makes much of the purported uncertainty regarding when Officer Monosky decided to charge Plaintiff with driving under the influence of *any substance* – suggesting that she initially arrested him for suspicion of driving under the influence of alcohol but later, after he passed the breathalyzer test, changed his official charge to driving under the influence of any substance – that dispute (if it even is a dispute) is not significant.  Even if Officer Monosky did initially arrest Plaintiff for driving under the influence of alcohol - a charge for which probable cause later dissipated after the breathalyzer result – the law of this Circuit holds that the arrest is still valid

Thus, the results of that one test for alcohol did not vitiate the officer's probable cause for arrest

under § 32-5A-191(a)(5).[52]

---

if probable cause existed to arrest and charge Plaintiff for a *closely related offense. Mills v. Wainwright*, 415 F.2d 787, 790 (5th Cir. 1969)("[W]hen a crime under which the arrest is made and a crime for which probable cause exists are in some fashion related, then there is no question but that there is a valid arrest."); *United States v. Atkinson*, 450 F.2d 835, 838 (5th Cir. 1971) (same). *See also Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997) ("[E]ven where there is no probable cause to arrest the plaintiff for the crime charged, proof of probable cause to arrest for a related offense is also a defense which may entitle the arresting officer to qualified immunity."); *Kelley v. Myler*, 149 F.3d 641, 647-48 (7th Cir. 1998) ("[E]ven if probable cause does not exist for the crime charged, proof of probable cause to arrest the plaintiff on a closely related charge is also a defense."); *United States v. Rambo*, 789 F.2d 1289, 1294 (8th Cir. 1986) ("Where a defendant is arrested for the wrong offense, the arrest is still valid if probable cause existed to arrest the defendant for a closely related offense.").

The related crimes defense asks "whether the conduct that served as the basis for the charge for which there was no probable cause could, in the eyes of a similarly situated reasonable officer, also have served as the basis for a charge for which there was probable cause." *Trejo v. Perez*, 693 F.2d 482, 486 (5th Cir. 1982). There can be no doubt that driving under the influence of any substance in violation of Ala. Code § 32-5A-191(a)(5) and driving under the influence of alcohol in violation of Ala. Code § 32-5A-191(a)(2) are closely related offenses. *See Babers*, 152 F.Supp.2d at 1310 (finding that driving under the influence of a controlled substance and driving under the combined influence of alcohol and a controlled substance are closely related offenses). Thus, Defendants are still entitled to qualified immunity on Plaintiff's claims for unlawful arrest and detention if a similarly situated, reasonable officer would have had probable cause to continue to detain Plaintiff on a charge of driving under the influence of a substance. *Babers*, 152 F.Supp.2d at 1310.

[52] In so finding, the court distinguishes this case from *Strickland*, in which the Middle District found that a defendant officer lacked probable cause to arrest or detain plaintiff Strickland for driving under the influence of a non-alcohol substance after he passed both a VGN test administered in the field and a breathalyzer test administered at the police department. *Strickland*, 399 F.Supp.2d at 1292-93. In *Strickland*, after the breathalyzer test conclusively ruled out alcohol as a cause for impairment, the court determined that the defendant officer had an affirmative duty to release Strickland because "no officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Strickland*, 399 F.Supp.2d at 1293 (internal quotations omitted).

*Strickland* is distinguishable. Although Plaintiff's test results in this case are not that dissimilar from those in *Strickland*, the evidence bolstering probable cause in this case is far greater than test results. Unlike Strickland, not only did Plaintiff admit that he had taken his blood pressure medication before driving, *a substance* which arguably affected his ability to safely operate a vehicle in violation of § 32-5A-191(a)(5), *see* discussion Section IV.B.3 *supra*, but the defendant officers

67

### 2.    Denial of Reasonable Opportunity to Procure Independent Testing

It is the conduct of Defendants Scarborough and Monosky related to the second part of Plaintiff's argument – that he was denied a reasonable opportunity to obtain alternative drug or alcohol testing – that the court finds more troubling.  Plaintiff complains that after completing the breathalyzer test, he requested repeatedly, of several officers present in the jail, the opportunity to submit to blood and urine tests[53] to prove that he had no other intoxicants in his system.  (Plaintiff Depo., pp. 55-62).  Plaintiff specifically identified having asked the "desk sergeant" and Officer Scarborough for a urine test. (Plaintiff Depo., pp. 58-60).  Plaintiff states:

> After the results of my breathalyzer test I requested a blood test or a urine analysis to prove that I was not on any other substances . . . . Having undergone many random drug and alcohol screenings during my employment as a truck driver, I was well aware of the procedure at the time of my arrest, and wished to prove my innocence. Despite my having requested a blood test and a urinalysis several times while in the custody of the Hoover jail, I was denied this opportunity.

---

in this case also discovered Ambien in his truck, a controlled substance which, if taken that morning, would have likely impaired his ability to safely operate his vehicle.  The officers' probable cause to arrest - and detain - Plaintiff for driving under the influence in this case far surpasses that present in *Strickland*.

[53] Attempting to create the appearance of ambiguity as to Plaintiff's request, Defendants state that Plaintiff "does not even know what kind of test he wanted; he testified he demanded a 'sobriety test,' a 'drug and blood test,' and a 'urine analysis.'" (Doc. # 42, at 14).  The effect of Defendants' argument, however, is to lend more credence to Plaintiff's testimony that he asked often and repeatedly for various types of tests in an effort to get the attention of the officers who were detaining him.  Whether or not he used the correct terminology is certainly not relevant, so long as he conveyed his request adequately.

(Plaintiff Aff., ¶ 11).[54]  Moreover, it is undisputed that at least one officer, whose identity is

unknown, responded to Plaintiff's request by stating that the breathalyzer was all that was required.

(Plaintiff Depo., p. 62).  Plaintiff was not allowed to make a telephone call, whether it be to arrange

bail or to arrange a drug test, until the day after his arrest. (Plaintiff Depo., pp. 75-76).  According

to Plaintiff's complaint, the alleged "refus[al] to allow plaintiff to make a telephone call, or to submit

to a blood test, as he requested, [was] an effort to prolong his unlawful confinement." (Doc. # 13-2,

Count II, ¶  42).

It is clear that, under Alabama law, Plaintiff had a statutory right to request independent

drug/alcohol testing after the officers administered the breathalyzer test. Alabama Code Section 32-

5A-194 provides as follows:

> (3) The person tested may at his own expense have a physician, or a qualified
> technician, registered nurse or other qualified person of his own choosing administer
> a chemical test or tests in addition to any administered at the discretion of a law
> enforcement officer.  The failure or inability to obtain an additional test by a person
> shall not preclude the admission of evidence relating to the test or tests taken at the
> direction of a law enforcement officer.

Ala. Code § 32-5A-194.  This statutory right to an independent blood test *only* arises after the

suspect has submitted to the test(s) administered at the discretion of the police officers.  *Ex parte*

*Yelverton*, 929 So.2d 438, 445 (Ala. 2005)(finding that even though the defendant had requested an

independent test, he "had no right to such a test because he had not met the condition precedent to

_____

[54] Although Officer Monosky testified that she did not hear Plaintiff request an alternative
test (Monosky Depo., p. 169), the court is required to view the facts in the light most favorable to
Plaintiff.  A review of *Plaintiff's* testimony makes clear that he requested alternative testing
repeatedly and often to several different officers, which may or may have included Monosky.
Although Defendants complain that Plaintiff "does not even recall or know to whom he allegedly
requested additional testing," (Doc. # 42, at 14), Defendants do not dispute that additional testing
was requested by Plaintiff while at the police department.

the creation of such a right - he had not taken the breath test that [the officer] was directing him to take"). The law does not impose a "positive duty" on police officers "to inform those charged with driving under the influence of their statutory right to additional testing." *Bush v. City of Troy*, 474 So.2d 164, 166 (Ala.Crim.App.1984), *aff'd*, 474 So.2d 168 (Ala.1985).[55]

However, Alabama law is clear that a police officer may not ignore a suspect's timely request for independent testing and cannot thwart the procurement of such testing. "[W]hen an accused requests an independent blood-alcohol test, law-enforcement officials must give him a *reasonable opportunity* to procure a timely independent blood-alcohol test at his own expense." *Yelverton*, 929 So.2d at 444 (emphasis added) (citing *Bilbrey v. State*, 531 So.2d 27, 29 (Ala.Crim.App.1988), *abrogated on other grounds*, *State v. Thrasher*, 783 So.2d 103 (Ala. 2000)). What constitutes a "reasonable opportunity" depends upon the totality of the circumstances of each case, although other courts have held that "the denial of telephone access constitutes a denial of the defendant's right to a reasonable opportunity to obtain his own test." *Bilbrey*, 531 So.2d at 29 (collecting cases). On the flip side, however, "a phone call may not always, in all circumstances, satisfy the minimal

---

[55] The Court of Criminal Appeals held:

> There is ... no obligation on the part of anyone to advise the defendant of the existence of [Ala.Code 1975, § 32-5A-194] or of his right to alternative testing at his own expense. The Legislature does require the testing officers to inform the person being tested of the consequences of his refusal to submit to the test. The Legislature could have made a law requiring that the testing officer discuss alternative testing. They did not. We will certainly not add something which the Legislature has not required to the already complicated responsibilities of these officers.

*Bush*, 474 So.2d at 166. *See also O'Connor v. City of Montgomery*, 462 So.2d 756, 757 (Ala.Crim.App.1984) ("The officer is not required to notify the accused that he may have an independent blood-alcohol test performed.") (citing *Parker v. State*, 397 So.2d 199 (Ala.Crim.App.1981)).

70

requirements." *Bilbrey*, 531 So.2d at 30.  Indeed, under the facts of one case, the Alabama Court of

Criminal Appeals held that a "reasonable opportunity" required police transportation to an off-site

testing facility after an arrestee had made arrangements for that testing.   *Lockard v. Town of Killen*,

565 So.2d 679, 682 (Ala.Cr.App. 1990)(noting, however, that it was "not making it a *per se* rule that

every person arrested for driving under the influence of alcohol should be automatically entitled to

police assistance in obtaining an independent blood alcohol test").

Viewing the facts in the light most favorable to Plaintiff in this case, his timely[56]  requests

for independent testing, were - at best - frustrated by neglect and denial of phone use, and were - at

worst - completely thwarted by misleading information that the breathalyzer test was "all that was

required." (Plaintiff's Depo. p. 55-62).  Defendants' averments that the jailer, not the Defendant

Officers, had discretion to allow telephone calls and that, pursuant to HPD policy, phone usage could

be temporarily delayed for arrests of driving under the influence (Doc. # 42, at 14), are quite beside

the point.  No Alabama court has held that generally applicable policies prohibiting phone usage

exempt an officer from the obligation to give arrestees a reasonable opportunity to procure

independent testing.  Rather, the cases suggest that if an officer is not permitted to give arrestees

permission to use the telephone, then an officer must find an alternative way to provide a requesting

arrestee with a reasonable opportunity to procure his test  – not deny the right altogether.  *See*

*Yelverton*, 929 So.2d at 444; *Bilbrey*, 531 So.2d at 29-30; *Lockard*, 565 So.2d at 682; *see also*

*Scarborough v. Kellum*, 525 F.2d 931, 933 (5th Cir. 1976) (observing that "at least when the police

---

[56] It is undisputed that Plaintiff's requests were made both before and after the police-administered breathalyzer test.  However, only the post-breathalyzer requests invoked his statutory right under *Yelverton*.

have good reason to deny a particular [Driving While Intoxicated] arrestee personal access to a telephone, a rejected offer to call anyone in the prisoner's behalf satisfies [] due process standards").

Moreover, it is incredulous for Defendants to suggest that Plaintiff forfeited his statutory right by using the one phone call he was eventually given to post bond rather than make arrangements for additional testing. (Plaintiff Depo., pp. 75-76).   It is undisputed that Plaintiff was not even allowed to use the telephone until over *twenty-seven* hours after he was arrested, far too late for an independent test to be relevant. (Plaintiff Depo. pp. 75-76).[57]

Under Alabama law, such "frustration" or "interference" with the statutory right to independent testing violates state procedural due process and gives rise to a claim therefore.  *Ex parte Yelverton*, 929 So.2d at 444 (citing *Bilbrey*, 531 So.2d at 29); *Lockard*, 565 So.2d at 680 ("Due process requires that when an accused has complied with police requests to submit to a blood alcohol test and subsequently requests an independent blood alcohol test, the accused must be allowed a reasonable opportunity to obtain a timely, independent test at his own expense, and police authorities may not frustrate his attempts to do so."). But the creation of a procedural due process claim by Alabama courts, under Alabama law, for deprivation of a right created by an Alabama statute, does

---

[57] Plaintiff testified as follows:

Q:    You arrived at the Hoover city police department . . . at what time on November 3rd, 2005?
A:    Maybe 10:30, 11:00.
Q:    Okay. And then how long did you stay at the Hoover Police Department before you were transferred to Jefferson County?
A:    From that time until 3:30 the following afternoon.
Q:    Okay. And what time did you make the one phone call . . . ?
A:    Sometime after I posted bond.
Q:    Okay. On November 4th?

(Plaintiff Depo. pp. 75-76).

not mean that the same deprivation gives rise to a *federal* due process violation.  This court, like at least one other court in this Circuit, "is not prepared to elevate the right to an independent blood test recognized in many states to federal constitutional stature." *U.S. v. Friend,* 736 F.Supp. 1134, 1136 -1137 (N.D. Ga.,1990) (observing that a denial of due process may lie where the state does not conduct a sobriety test upon arrest and then prohibits the defendant from obtaining an objective test at his or her own expense, but distinguishing that scenario from the facts of that case (and this case), in which the plaintiff was given a breathalyzer test when he was arrested).  And even if the court were willing to create such a claim, no federal procedural due process claim was pled in the complaint.

Thus, the question arises, "[i]s qualified immunity defeated where a defendant violates any clearly established duty, including one under state law, or must the clearly established right be the federal right on which the claim for relief is based?"  *Elder v. Holloway,* 510 U.S. 510, 515 (1994)(summarizing the "discrete" question addressed by *Davis v. Scherer*, 468 U.S. 183 (1984)). Fortunately for Defendants, the Supreme Court "held the latter." *Elder*, 510 U.S. at 515 (citing *Davis*, 468 U.S. at 193-196, and n. 14)).  As the Court pronounced in *Davis*, "[n]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation - of federal or of state law - unless that statute or regulation provides the basis for the cause of action sued upon." *Davis*, 468 U.S. at 194 n. 12.  Here, as in *Davis*, "there is no claim that the state [statute] . . . create[s] a [federal] cause of action for damages or provide[s] the basis for an action brought under § 1983." *Davis*, 468 U.S. at 194 n. 12.  While it is certainly "an appealing proposition that the violation of [the Alabama statute] is a circumstance relevant to the official's claim of qualified

73

immunity,"[58] *Davis*, 468 U.S. at 195, the Supreme Court has held that it is not, and that ends the inquiry.[59]  Therefore, while Defendants' failure to afford Plaintiff his statutory right to alternative testing gives rise to a due process claim under Alabama law, it is - unfortunately for Plaintiff - federally insignificant.[60]

Accordingly, the court finds that, despite the favorable breathalyzer test results and denial of Plaintiff's statutory right to independent testing, the continued detention of Plaintiff for driving under the influence was not an unreasonable seizure under the Fourth Amendment.  Defendants are therefore due the protection of qualified immunity on this claim.[61]

---

[58] Indeed, had the holding of *Davis* gone the other way, it would be quite logical for this court to conclude that the officers' failure to provide Plaintiff with a reasonable opportunity to procure independent testing is relevant to the reasonableness of their detainment of him under the Fourth Amendment.

[59] Although appealing, the court recognizes that it is a dangerous proposition that would open the door for "officials [to be] liable in an indeterminate amount for violation of any constitutional right - one that was not clearly defined or perhaps not even foreshadowed at the time of the alleged violation - merely because their official conduct also violated some statute or regulation." *Davis*, 468 U.S. at 195.

[60] The court distinguishes this concept from a theory of supervisory liability under § 1983 which arises when the supervisor "breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury." *Williams*, 689 F.2d at 1381 (quoting *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976)); *See also Zatler*, 802 F.2d at 401 (outlining the various methods of establishing supervisor liability under § 1983).

[61] As the court has previously held as to the other claims that do not rise to the level of a constitutional violation, Defendants' compliance with the Fourth Amendment disposes of the court's need to address the second "clearly established" portion of the qualified immunity analysis.

F.      Continued Prosecution of Plaintiff

Plaintiff next alleges that the Defendant Officers'[62] continued "prosecution" of him "despite knowledge of his innocence is actionable malicious prosecution." (Doc. # 35, at 24-27). This Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003).[63] "[A]lthough both state law and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." *Wood*, 323 F.3d at 882. "To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures." *Kingsland*, 382 F.3d at 1234. The court will examine each requirement in turn.

As an initial matter, however, the court notes that Plaintiff's malicious prosecution claim, which arose from his warrantless arrest, accrued only after his "arraignment or indictment," not simply after his arrest. As the Eleventh Circuit has observed, "[i]n the case of a warrantless arrest, the judicial proceeding does not begin until the party is arraigned or indicted" and thus, "'the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced

---

[62] As noted earlier, the undisputed facts indicate that all three of the Defendant Officers were causally connected to the continued prosecution of Plaintiff for the two charges against him. *See* discussion in the introduction to Section IV, *supra*.

[63] The Supreme Court held that substantive due process could not serve as the basis for a § 1983 malicious prosecution claim, but left open the question whether the Fourth Amendment could do so. *Albright*, 510 U.S. at 275. "While there is no definitive Supreme Court decision, our C[ircuit] has recognized the constitutional tort of malicious prosecution under the Fourth Amendment." *Wood*, 323 F.3d at 882 n. 14.

(*e.g.*, the time of the arraignment), not the time of the preceding warrantless arrest.'" *Kingsland*, 382

F.3d at 1235 (quoting *Mejia v. City of New York*, 119 F.Supp.2d 232, 254 (E.D.N.Y.2000)).  Thus,

this claim relates to the actual prosecution of Plaintiff's claim by the district attorney – not the

Defendant Officers' continued detention of Plaintiff after the arrest, which formed the basis of the

claim discussed in Section IV.E.*, supra*.[64]

### 1.     Proof of the Elements of the Alabama Law Malicious Prosecution Claim

According to the Alabama Supreme Court, a state law claim for malicious prosecution

requires proof:  "(1) that the present defendant instituted a prior judicial proceeding against the

present plaintiff; (2) that in instituting the prior proceeding the present defendant acted without

probable cause and with malice[65]; (3) that the prior proceeding ended in favor of the present plaintiff;

---

[64] Plaintiff's brief in opposition to summary judgment does not make this distinction clear. (Doc. # 35, at 24-27).  Although Plaintiff *eventually* summarizes his malicious prosecution claims as the "[lack of] admissible evidence of intoxication and [] probable cause to prosecute" (Doc. # 35, at 26)(as to his driving under the influence charge) and "prosecut[ion] for months before the charges were dropped" (Doc. # 35, at 27)(as to his felony possession charge), the *remainder* of his discussion of these claims focuses on events that occurred after his arrest but prior to the actual institution of the prosecution.

[65] Under federal law, the existence of probable cause for the criminal proceeding defeats the claim. *See Wood*, 323 F.3d at 881-82; *Kjellsen*, 517 F.3d at 1237 ("[L]ack of probable cause is a required element to prove a § 1983 claim for malicious prosecution in violation of the Constitution."); *Kingsland*, 382 F.3d at 1234-35 (noting that § 1983 malicious prosecution claim turned on "whether there was an absence of probable cause for the original criminal proceeding, and whether there was malice on the part of the defendants"). However, "[i]t is well settled that in an action to recover damages for malicious prosecution where [] the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury." *Good Holding Co. v. Boswell*, 173 F.2d 395, 399 (5th Cir. 1949). As noted earlier, the existence of probable cause is measured at the time the original judicial proceeding is commenced, and not at the time of arrest.

Under Alabama law, which informs the court's analysis of the elements of the common law tort of malicious prosecution, "probable cause" is defined as "such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." *Delchamps, Inc. v. Morgan*, 601 So.2d 442,

and (4) that the present plaintiff was damaged as a result of the prior proceeding." *Delchamps, Inc. v. Bryant*, 738 So.2d 824, 831-32 (Ala.1999).   The Alabama Supreme Court has noted that proof of "[a]ll of these elements [is] essential . . . because an action for malicious prosecution is not favored at law." *Alabama Power Co. v. Neighbors*, 402 So.2d 958, 962 (Ala. 1981).

In this case, Defendants challenge the threshold matter of whether they were actually the instigators of the judicial proceeding against Plaintiff.   "It is axiomatic that there can be no cause of action for malicious prosecution unless the evidence shows that the judicial proceeding was instigated by the defendant." *Neighbors*, 402 So.2d at 962.[66]   Because the court finds, as a matter of law, that none of the Defendants were the legal cause of the prosecution of Plaintiff on criminal charges, Plaintiff's claim for malicious prosecution against them fails.

---

445 (Ala.1992).  Malice may be inferred from a lack of probable cause. *See, e.g., Peterson v. Crawford*, 268 Fed. Appx. 879, 882 (11th Cir. 2008) (per curiam) (noting that when there is no probable cause for an arrest, a jury may infer malice).  The Alabama Supreme Court has held:

> Malice is an inference of fact, and it may be inferred from a lack of probable cause or from mere wantonness or carelessness if the actor, when doing the act, knows it to be wrong or unlawful. *Bryant,* 738 So.2d at 833. Personal ill will or a desire for revenge is not essential for a finding of malice. *Delchamps, Inc. v. Larry*, 613 So.2d 1235, 1239 (Ala.1992). However, an inference of malice drawn from the lack of probable cause may be rebutted by evidence showing that the defendant acted in good faith. *Bryant,* 738 So.2d at 832.

*Wal-Mart Stores, Inc. v. Goodman*, 789 So.2d 166, 174 (Ala.2000).

[66] However, a malicious prosecution claim does not evaporate once the judicial proceeding has begun.  "Probable cause is required to continue a prosecution, not just to arrest a defendant or to institute a prosecution." *Kjellsen v. Mills*, 517 F.3d 1232, 1238 (11th Cir. 2008); *see also Wood*, 323 F.3d at 882 (noting that "a criminal prosecution ... continued ... without probable cause" can be a malicious prosecution); *Poff v. Hayes*, 763 So.2d 234, 241 (Ala. 2000)("A cause of action for malicious prosecution is not limited to the situation where the present defendant initiated the prior proceeding; it also arises in the situation where the present defendant continued the prior proceeding without probable cause.").

The Alabama Supreme Court has held:

> If a defendant merely gives the district attorney's office information regarding an alleged crime, leaving the decision to prosecute entirely to the uncontrolled discretion of the district attorney, who thereafter makes his own independent investigation and thereupon takes the information before the grand jury which returns indictments against the suspects, the defendant, in a malicious prosecution action, is not regarded as having instigated the criminal proceeding.

*Neighbors*, 402 So.2d at 962. Nevertheless, "giving information to the district attorney's office shields the malicious prosecution defendant only if []he 'states all the material facts bearing thereon within his knowledge.'" *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015 (Ala. Civ. App. 1999)(quoting *Neighbors*, 402 So.2d at 962)). If one "corruptly or oppressively brings about the indictment or prosecution of another maliciously and without probable cause ... by [method of] fraud, perjury, subornation, or by the willful suppression of known material facts, the intentional thwarting of a fair investigation," *Neighbors*, 402 So.2d at 965, he is the initiator of the judicial proceeding against the malicious prosecution plaintiff.

With respect to police officers specifically, the Eleventh Circuit has observed that "defendant police officers were not the legal cause of the original proceeding where there was no evidence that they had anything to do with the decision to prosecute or that they had 'improperly influenced' that decision." *Williams v. Miami-Dade Police Dept.*, 297 Fed.Appx. 941, 947 (11th Cir. 2008)(quoting *Eubanks v. Gerwen*, 40 F.3d 1157, 1160-61 (11th Cir. 1994)). However if the judicial proceeding was the result of "deception" by the police officer, or if the prosecutor relied upon evidence fabricated by a police officer in prosecuting the plaintiff, the officer may be "the legal cause of the original prosecution." *Williams*, 297 Fed.Appx. at 947 (quoting *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989)); *see also Eloy v. Guillot*, 289 Fed.Appx. 339, 340-42 (11th Cir. 2008) (holding that

a plaintiff established a § 1983 claim where the police officer responsible for his arrest allegedly

fabricated evidence against him); *Burdeshaw*, 350 F.Supp. 2d at 951, n.6 (noting the arresting officer

"prosecuted criminal charges against [the arrestee] by testifying before the grand jury which indicted

[the arrestee]").

In this case, there is no evidence that any of the Defendant Officers were the legal cause of

Plaintiff's prosecution by "improperly influencing" the decision to prosecute, deceiving the district

attorney, or fabricating evidence.  Although Plaintiff points out that, a few days after his arrest and

release, he returned to City Hall to show the prescription bottle to Scarborough,[67] it is undisputed that

Scarborough was not contacted by the district attorney after that time and never testified in favor of

the prosecution. (Scarborough Depo. p. 74).  Thus, based upon the contours of "instigation" of a

proceeding, as defined by the Eleventh Circuit and the Alabama Supreme Court, the evidence in this

case is not sufficient to suggest that Scarborough unduly influenced or deceived the prosecutor.

Indeed, there is no evidence that Scarborough  lied about the prescription after the matter had been

referred to the district attorney – in fact, there is no evidence that he provided any information at all

to the prosecutor.[68]

---

[67] The evidence supports Defendants' assertion that "only one defendant, Sergeant Scarborough, [] knew that Angeline supposedly located the prescription bottle for his Ambien on the day he was released from Jefferson County."  (Doc. # 42, at 18).  Scarborough admits that "a few days" after Plaintiff was released, Plaintiff "came back, wanted to talk to me and had a prescription bottle with him and told me that the prescription bottle was in his vehicle and all the other meds that he had and wanted us to drop the charges against him on that."  (Scarborough Depo. p. 68). Scarborough "told him that we couldn't drop the drug charge, that he would have to go to court on that."  (Scarborough Depo. p. 69).

[68] Nor do the cases support an affirmative - and continuing - obligation on the part of police officers to provide information to the prosecutor that comes to their attention after a suspect is released.  And even if this court were to find that such an affirmative duty existed (which it does not), it was certainly not "clearly established" that Scarborough had such a duty, and he would

Thus, the court finds that Defendants were not, as a matter of law, instigators of the judicial proceeding against Plaintiff and that, therefore, they are due the protection of qualified immunity on this claim.[69] But the claim also fails for an alternative reason – Plaintiff has not alleged a cognizable violation of the Fourth Amendment and therefore fails to satisfy this Circuit's second requirement for a federal malicious prosecution claim under § 1983. *Kingsland*, 382 at 1234.

>    **2.    Proof of a Violation of Fourth Amendment Right to Be Free of Unreasonable Seizures**

As the Eleventh Circuit has clarified, a § 1983 malicious prosecution claim lies in the Fourth Amendment only where the plaintiff, as part of the commencement of a criminal prosecution, is unlawfully and forcibly detained:  "[l]abeling ... a section 1983 claim as one for a 'malicious prosecution' can be a shorthand way of describing a kind of legitimate section 1983 claim: the kind of claim where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead." *Whiting v. Traylor*, 85 F.3d 581, 584 (11th Cir. 1996). Moreover, in addition to a showing of detainment, the plaintiff also must show he was detained "in relation to" the malicious prosecution. *See Kingsland*, 382 F.3d at 1235.

The Eleventh Circuit's requirement of an actual seizure is fatal to Plaintiff's § 1983 claim in this case.  In *Kingsland*, the plaintiff brought a § 1983 malicious prosecution claim based upon events which occurred during the time period after she was released on bond the day after her arrest.

---

therefore still be due the protection of qualified immunity.

[69]    It is for this same reason – Plaintiff's failure to satisfy all of the elements of the "disfavored" Alabama law malicious prosecution claim – that his state law claim for malicious prosecution fails.

*Kingsland*, 382 F.3d at 1235-36.  She was not incarcerated, but she was obligated to appear in court at her arraignment and at two subsequent hearings.  *Kingsland*, 382 F.3d at 1235.  The Eleventh Circuit rejected the district court's findings that Kingsland was subjected to a "continuing seizure" for Fourth Amendment purposes, and found that the following required actions did not constitute a sufficient seizure in relation to the prosecution:  (1) requirement that Kingsland pay a $1,000 bond; (2) obligation to appear at her arraignment; and (3) travel from New Jersey to Florida on two occasions to defend herself in court.  *Kingsland*, 382 F.3d at 1235-36.  The court noted: "[w]hile we sympathize with Kingsland's anxiety and inconvenience, assuming the facts in her complaint to be true, we cannot go so far as to say that the conditions of her pretrial release - which did not constitute a significant deprivation of liberty - constituted a seizure violative of the Fourth Amendment." *Kingsland*, 382 F.3d at 1236 (citing *Myers v. Shaver*, 245 F.Supp.2d 805, 812 (W.D. Va.2003) ("Though a summons may impose a burden, a defendant summoned to appear in a criminal case faces no greater restraint than the person summoned for any number of a host of civic responsibilities.")).

    As in *Kingsland*, Plaintiff in this case was not detained again or otherwise held over by the officers after his post-arrest release.  Although he was required to pay a bond and to appear in court during the several months before all charges against him were dismissed at the request of the district attorney on March 29, 2006 (Doc. # 40, Exhibit T), the Eleventh Circuit determined in *Kingsland* that those pretrial requirements do not rise to the level of Fourth Amendment seizures.  382 F.3d at 135-36.  Accordingly, for this alternative reason, Plaintiff's federal malicious prosecution claim fails under § 1983, and Defendants are due qualified immunity on this claim.

81

V.      **State Claims Against Officers Scarborough, Holder, and Monosky**

As outlined previously in Section III, *supra*, only two independent state law claims remain -

false arrest/false imprisonment and malicious prosecution.  (Doc. # 13-2)(Counts Two and Six).  The

analysis of those state law claims is substantially similar to the federal analysis of their companion

§ 1983 Fourth Amendment claims,[70] with the noted exception of a Fourth Amendment component

to the federal malicious prosecution claim that is not required under state law.[71]  *See* discussion

---

[70]  The court observes that neither of the parties' summary judgment briefs distinguish the substantive analysis of the federal claims from the substantive analysis of the state law claims. (*See* Docs. # 32, 35, 42).  Indeed, the *only* time that either party specifically addresses the state law claims is when the parties examine the applicability of state agent immunity.  (*See* Docs. # 32, at 18-20; 35, at 27-29; 42, at 19-20).  Given that dearth of argument targeted at the state law claims, Defendant's reply brief suggests that "[c]ontrary to the Complaint, in the plaintiff's Opposition, it appears that claims for malicious prosecution, false imprisonment, and false arrest are brought pursuant to Section 1983 as opposed to state law."  (Doc. # 42, at 20 n.4).  The court is not inclined, however, to conclude that Plaintiff has waived all of his state law claims, as Plaintiff's opposition brief does mention state agent immunity.  (Doc. # 35, at 27-29).

[71]  Indeed, the court necessarily considered the merits of an Alabama malicious prosecution claim as the first component of its companion federal claim. *See* discussion Section IV.F.1, *supra.* With respect to the probable cause federal and state claims (false arrest/imprisonment for the two charges against Plaintiff), the court finds that the only difference is which party carries the burden of proving whether probable cause existed.  The existence of probable cause constitutes an affirmative defense to the claims of false arrest and imprisonment under Alabama law such that Defendants have the burden of demonstrating the existence of probable cause as a defense to the state claim.  *See Franklin v. City of Huntsville*, 670 So.2d 848, 852, (Ala.1995) ("[P]robable cause must exist to make a lawful arrest"); *see also* § 15-10-3(a)(1) (authorizing an officer to arrest a person without a warrant, "if a public offense has been committed or a breach of the peace threatened in the presence of the officer").  As to the federal claims under § 1983, however, Plaintiff has the burden of demonstrating the absence of probable cause in order to succeed. *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997) ("In order to establish a Fourth Amendment violation, [plaintiff] must demonstrate that a seizure occurred and that it was unreasonable."); *see also Rivas v. Freeman*, 940 F.2d 1491, 1496 (11th Cir. 1991) ("To successfully litigate a lawsuit for deprivation of constitutional rights under 42 U.S.C. section 1983, a plaintiff must show violation of a constitutionally protected liberty or property interest and deliberate indifference to constitutional rights.").  This is a distinction without a difference, however, when it comes to the court's ultimate conclusion on the merits of these claims.

Section IV.F.2, *supra*.  Accordingly, as to all but Plaintiff's state law claim of false arrest/ imprisonment for possession of a controlled substance, which the court has already determined survives summary judgment under federal law, *see* discussion Section IV.D, Plaintiff's state law claims of false arrest/imprisonment for driving under the influence and malicious prosecution fail for the same reasons as their companion federal claims.  *See* discussion Sections IV.B, E, and F.[72]

Accordingly, as to the one remaining state law claim of false arrest/imprisonment for possession of a controlled substance that survived the merits analysis, the court now must determine whether Defendants are due the protection of state agent immunity.  Alabama Code § 6-5-338 grants statutory immunity from tort liability to municipal police officers for "conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a).[73] Such immunity "shields [an] employee from liability if the employee is engaged in a

---

[72] The court incorporates that analysis by reference but will not repeat it herein, both to avoid redundancy and because the parties themselves did not separately analyze the state law claims.

[73] Section 6-5-338 provides, in pertinent part:

(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a).

discretionary act, instead of a ministerial one, when the alleged tortious conduct occurs." *McDonough v. Parker*, 781 So.2d 936, 938 (Ala. 2000) (internal quotations omitted). "Discretionary acts have been defined as those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996).[74]

Accordingly, state officials like Defendants are immune from liability for "exercising judgment in the enforcement of the criminal laws of the state, including, but not limited to, law-enforcement officers arresting or attempting to arrest." *Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000).  The Alabama Supreme Court has repeatedly held that actions by an officer in executing an arrest are generally considered discretionary functions for purposes of § 6-5-338.  *Swan v. City of Hueytown*, 920 So.2d 1075, 1079 (Ala. 2005)(holding that "arrests and attempts to arrest are generally classified as actions requiring an officer to exercise judgment"); *see also Wright*, 682 So.2d at 2; *Ex parte City of Montgomery*, 758 So.2d 565, 569-71 (Ala.1999); *Sheth v. Webster*, 145 F.3d 1231, 1238-39 (11th Cir. 1998).

Nevertheless, even a police officer's entitlement to immunity during the course of an arrest may be abrogated by conduct that is "so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." *Couch v. City of Sheffield*, 708 So.2d 144, 153 (Ala. 1998). Therefore, discretionary function immunity shields the Defendants Officers from tort liability except

---

[74] "'Ministerial acts,' on the other hand, are those acts 'done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done.'" *McDonough*, 781 So.2d at 938 (quoting *Carroll v. Hammett*, 744 So.2d 906, 910 (Ala. 1999)).

to the extent that a reasonable jury could conclude that their actions were willful, malicious, fraudulent, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. *Ryan v. Hayes*, 831 So. 2d 21, 28 (Ala. 2002); *Wright*, 682 So.2d at 2; *Ex parte City of Montgomery*, 758 So.2d at 569-71; *Sheth*, 145 F.3d at 1238-39.

"To qualify for immunity under [ § 6-5-338, the Defendant Officers] must show [that they were] engaged in a discretionary function when the alleged tort occurred." *Eubanks v. City of Mount Brook*, 197 Fed.Appx. 819, 822 (11th Cir. 2006)(citing *Sheth*, 145 F.3d at1238). Then to deny [the officers] immunity, the burden shifts to Plaintiff to demonstrate that [the officers] acted in bad faith, with malice or willfulness. *Eubanks*, 197 Fed.Appx. at 822 (citing *Sheth*, 145 F.3d at 1239).

That *Plaintiff* bears the burden to show that state agent immunity is abrogated because of malicious conduct by the officers is dispositive of the matter of state law immunity in this case. In his opposition to summary judgment, "Plaintiff [] neither allege[s] nor offer[s] evidence that [the Defendant Officers] acted in bad faith." *Eubanks*, 197 Fed.Appx. at 822. Accordingly, Plaintiff utterly failed to meet his burden of showing that Defendants' presumptive discretionary function immunity is abrogated. For this reason, Defendants are due summary judgment as to Plaintiff's one remaining state law claim of false arrest/imprisonment for possession of a controlled substance.

As a final note, the court observes that it is not inconsistent to, on the one hand, deny qualified immunity to Defendants with respect to a federal claim while, on the other hand, grant discretionary function immunity to Defendants as to the same companion state law claim. Although both forms of immunity place the initial burden on Defendants to establish that they were acting within their discretionary authority when the allegedly wrongful event occurred that gave rise to both claims, *see Sims*, 972 F.2d at 1236 (qualified immunity); *Sheth*, 145 F.3d at 1238 (discretionary

function immunity), the burden that then shifts to Plaintiff differs greatly.  With respect to qualified immunity, Plaintiff must only show "that the defendant has committed a constitutional violation . . . that . . . was 'clearly established' at the time he did it." *Crosby*, 394 F.3d at 1332 (citation omitted).  With respect to discretionary function immunity, however, the burden is much greater. Plaintiff must go beyond the showing that a violation occurred (whether it be the result of negligence, or otherwise) and raise a jury question as to whether Defendants committed that violation in bad faith or out of malice.  *Couch*, 708 So.2d at 153.  It is that distinction which is the rub in this case.

## VI.   Claim Against the City and Chief Derzis

Plaintiff's sole remaining claim against the City and Chief Derzis, *see* discussion Section III *supra*, is based upon one unified allegation:   "the City of Hoover's failure to promulgate a proper policy governing inventory searches . . . . [c]ombined with Chief Derzis' blessing of the defendants' conduct in this case as meeting all of HPD's policies," is "directly responsible" for the "improper search" conducted by Defendants Holder and Monosky.   (Doc. # 35, at 14, 16).   Nevertheless, the proper analysis of that claim involves slightly different standards of liability with respect to each Defendant because the City is a municipality while Chief Derzis meets the traditional definition of "person" under § 1983.   Thus, the court will address each Defendant separately.

### A.   Claim Against The City

Although it is true that municipalities and other local government entities are included among those persons to whom § 1983 applies, *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), the law is clear that a City may not be held liable on a *respondeat superior* theory, *Board of County Commissioners v. Brown*, 520 U.S. 397, 403 (1997).  Therefore, a § 1983 claim can

lie against the City only if Plaintiff has shown that "the [alleged] constitutional deprivation resulted from a custom, policy, or practice of the municipality." *Wideman v. Shallowford Comm. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987)(citing *Monell*, 436 U.S. at 691). To accomplish this, Plaintiff must establish: (1) that his constitutional rights were violated; (2) that the City had a policy or custom that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). A custom is a practice that is so settled and permanent that it takes on the force of law. *Monell*, 436 U.S. at 691. To establish the liability of a municipality based on a custom, "it is generally necessary to show a persistent and widespread practice. Moreover, actual or constructive knowledge of such customs must be attributed to . . . the municipality. Normally, random acts or isolated incidents are insufficient." *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994)(citation omitted). Finally, for liability to attach, the City's customs, policies, or practices must have been the "moving force" of the alleged constitutional violation. *Monell*, 436 U.S. at 694-95.

Here, the court need not even reach the question of whether any City policy, practice, or custom led to the alleged unconstitutional search of Plaintiff's vehicle, because the court has already found that no constitutional violation occurred in the first instance. *See* discussion Section IV.C, *supra*. The City cannot be liable if the Defendant Officers are not liable. As the court has already determined that the "officers' actions were constitutionally permissible, [] there can be no policy or custom of the City that 'officially sanctioned or ordered' a constitutional violation." *McCormick*, 33

87

F.3d at 1243 (*citing Brown v. City of Clewiston*, 848 F.2d 1534, 1538 (11th Cir. 1988)).  In such a situation, the municipality's policies are "quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(finding that if the plaintiff has suffered no constitutional injury at the hands of the individual police officer upon whose conduct the claim is predicated, then there is no municipal liability).  For this reason, summary judgment in favor of the City is appropriate on this claim.

In any event, and alternatively, the court finds no constitutional deficiencies in the policies and practices of the City that govern inventory searches.  Plaintiff criticizes the City's *written* inventory policy as "contain[ing] not one sentence providing any 'standardized criteria' restraining the discretion of police officers in conducting an inventory search, particularly whether and in what circumstances sealed containers may be opened during an inventory search," (Doc. # 35, at 14), which Plaintiff believes gave "officers carte blanch to conduct illegal warrantless searches of every vehicle driven by a suspect under arrest," (Doc. # 35, at 16).  Plaintiff's argument cuts no ice at all. As outlined earlier in Section IV.C., *supra*, the City's written policy is not the sole source of guidance to officers regarding the conduct of inventory searches –   City officers also follow numerous established, but unwritten, routines that give specific guidance depending upon the circumstances encountered, such as (as relevant in this case) what to do when an officer encounters medications or loose pills during the inventory. *See Wells*, 495 U.S. at 4 (holding that standard inventory procedures may be established by either "standardized criteria . . . or established routine"). And the court has already determined that the particular procedure followed by the Defendant Officers in this case - retrieving and identifying all medications located during an inventory – was constitutionally sufficient.  *See Wells*, 495 U.S. at 4 (reiterating that an inventory policy need not

mandate that the opening of containers "be conducted in a totally mechanical 'all or nothing fashion'"); *see also Andrews*, 22 F.3d at 1336 (finding that none of the relevant Supreme Court decisions require "a law enforcement agency's inventory policy to address specifically the steps that an officer should take upon encountering a closed container"). Thus, there is no evidence in this case that a City policy, practice, or custom led to the alleged unconstitutional search of Plaintiff's vehicle.[75]   Accordingly, the court finds that, for this alternative reason, the claim against the City fails.

### B.   Claim Against Chief Derzis

As with municipalities, it is axiomatic that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotations omitted). Thus, supervisory liability occurs only when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (per curiam); *Wilson v. Attaway*, 757 F.2d 1227, 1241 (11th Cir. 1985).

As to the latter, the necessary causal connection may be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez v. Reno*, 325 F.3d at 1228, 1234 (11th Cir. 2003)

---

[75] Beyond the language of the policy, Plaintiff offers scant other evidence that the City "provides no guidance to prevent officers from using the inventory search loophole to conduct unbridled and unconstitutional warrantless searches for evidence to support criminal charges." (Doc. # 35, at 15).  Indeed, the *only* other evidence offered by Plaintiff "is the defendants' conduct of the inventory search in this very case." (Doc. # 35, at 15).   That paltry evidence of "unbridled and unconstitutional warrantless searches" is simply not sufficient to state a claim against the City.

(quoting *Braddy v. Fla. Dept. of Labor & Employment*, 133 F.3d 797, 802 (11th Cir. 1998)). "[But t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Alternatively, the causal connection may also be established when a supervisor's "custom or policy ... result[s] in deliberate indifference to constitutional rights" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1235 (internal quotations omitted); *Hartley v. Parnell*, 193 F.3d 1263, 1263 (11th Cir. 1999). Regardless, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234 (internal quotation marks and citation omitted).

Here, Plaintiff claims that Chief Derzis "blessed" the officers' inventory search of Plaintiff's vehicle based upon the following statement in his affidavit:

> Having reviewed the facts of this case, the circumstances giving rise to Mr. Angeline's arrest and the officers' actions and decisions in effectuating the same, I determined that they acted appropriately and within the line and scope of their employment with the City of Hoover. Their decisions and actions taken on November 3, 2005 were carried out in conformity with the HPD training and policy and all applicable federal, Alabama, and City of Hoover laws.

(Derzis Aff., at pp. 3-4). As was the case with the claim against the City, Chief Derzis cannot be liable for the alleged unconstitutional search of Plaintiff's vehicle because the court has already found that no constitutional violation occurred in the first instance. *See* discussion Section IV.C, *supra*; *see also McCormick*, 33 F.3d at 1243; *Heller*, 475 U.S. at 799.

Alternatively, and in any event, Plaintiff's claim fails regardless of whether he seeks to hold Chief Derzis liable as a "personal participant in the alleged constitutional violation" or because "there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." *Lewis*, 855 F.2d at 738.  First, there is no evidence that Chief Derzis personally participated in, or even directed from afar, the search of Plaintiff's vehicle. It simply does not follow that Chief Derzis' post-search "blessing" of the officers' conduct translates into participation in the search or even establishes a causal connection to the search.  Chief Derzis' opinion that the search was appropriate no more makes him liable for the search than this court's opinion that the search was constitutional makes the undersigned liable therefore.

Thus, the only remaining theory of liability for Chief Derzis is a causal connection to the search based upon his status as a policy-maker or trainer who *generally* directed or permitted HPD officers to conduct impermissible inventory searches, which then led to the allegedly unlawful search in this case.  The Supreme Court has established that "the inadequacy of police training may serve as a basis for § 1983 liability." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). However, such liability attaches "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Harris*, 489 U.S. at 388.[76]

Plaintiff has presented no evidence of a causal connection between Chief Derzis and the search of Plaintiff's vehicle.  There is no evidence that Chief Derzis is a policy maker – he was not charged with promulgating, drafting, or otherwise establishing HPD written policies or procedures.

---

[76] "This C[ircuit] similarly has recognized that a municipality is liable under § 1983 if the plaintiff's injury was caused by a 'pattern of improper training' of police officers, of which the municipality was aware and deliberately indifferent." *Wakefield v. City of Pembroke Pines*, 269 Fed.Appx. 936, 940 (11th Cir. 2008)(*quoting Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005)).

(Derzis Aff., pp. 1-2). Nor is there any evidence that Chief Derzis, on any prior occasion, has trained or instructed officers to act unlawfully with regard to "inventory searches." *Gonzalez*, 325 F.3d at 1234. Finally, there is no allegation – much less evidence – of "widespread abuse" of the inventory policy by officers that was "obvious, flagrant, rampant and of continued duration" and of which Derzis should have known. *Brown*, 906 F.2d at 671. Even assuming that the search at issue here was unconstitutional (which it was not), the undisputed evidence is that it was an isolated occurrence, as Plaintiff effectively admits when the only evidence of policy violations that he can point to " is the defendants' conduct of the inventory search in this very case." (Doc. # 35, at 15).

Ultimately, an official like Chief Derzis cannot be held liable for merely instituting a "facially constitutional policy" like the one in this case.[77] *Marsh v. Butler County*, 268 F.3d 1014, 1036 (11th Cir. 2001); *see also City of Campon v. Harris*, 489 U.S. 378, 387 (1989). For all of these reasons, Chief Derzis is due summary judgment on the claim against him.

## VII.    Conclusion

For all of the reasons outlined above, the court finds that the Defendants have carried their burdens on summary judgment of demonstrating that there are no material facts in dispute and that they are entitled to judgment as a matter of law on all of the claims against them, with the exception of Plaintiff's § 1983 Fourth Amendment claim against Defendants Holder and Monosky alleging false arrest and detainment on the charge of  felony unlawful possession of a controlled substance.

---

[77] The court has already determined that the policy is this case contained no constitutional deficiencies.  It is a heavy burden to show that a policy is facially unconstitutional – "no set of circumstances [can] exist[] under which [the policy] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

As to that one § 1983 claim against Defendants Holder and Monosky relating to Plaintiff's arrest and detainment for felony possession, the motion for summary judgment will be denied. As to all other claims, the motion for summary judgment will be granted. A separate order will be entered.

**DONE** and **ORDERED** this _____30th_____ day of March, 2009.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

93